## BUCKLEY v. UNITED STATES.

Circuit Court of Appeals, Sixth Circuit.
July 12, 1929.

No. 5479.

714

Henry A. Williams, of Columbus, Ohio, and W. B. Turner and R. N. Brumbaugh, of Dayton, Ohio, for appellant.

Haveth E. Mau, U. S. Atty., of Cincinnati, Ohio.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. ▉ Buckley and others were convicted of offering a bribe to an enforcement officer under the National Prohibition Act (27 USCA) to induce him to refrain from his official duty. Buckley alone appeals. The return, in the form of a printed record, not having been filed within the time fixed, the United States moved to docket and dismiss. Being satisfied that the failure to file was an inadvertence, the time for that purpose will be extended so as to cover the date of actual filing. Shea v. U. S. (C. C. A. 6) 224 F. 426. In connection with this motion, we directed briefs to be filed upon both sides upon the merits, and we heard oral argument thereon, thus practically advancing the case, in order that the delay in making the return should not have the effect of delaying the hearing.

The materiality and effect of the errors alleged can best be judged in connection with the facts. In October, 1928, Buckley was state treasurer of Ohio, approaching the end of his two-year term, and a candidate for re-election (he was re-elected in November). He was regarded as one of the leaders of one of the political parties and was thought to be very influential with other state officers. He was located at the state capitol at Columbus, which was also the location of the district headquarters of the national prohibition force covering the state. Some agents from this headquarters made a raid upon a brewery in Cincinnati, discovering there a quantity of beer having unlawful alcoholic strength. The brewery and its managers feared criminal prosecution and the loss of its permit. They engaged Gruber and Schrimper, Cincinnati lawyers, to look after their interests. Schrimper had been a member of the Legislature and was active in a Cincinnati political organization; Gruber let it be understood that he represented a large group of trade unions and was politically influential. The lawyers procured from a common friend a special introduction to Buckley and went to Columbus to see him. They told him the story of the raid—telling

him, however (untruly), that the quantity of the illicit liquor was only four barrels. He told them that he was acquainted with John Eckhart, the Assistant National Prohibition Director for the district, and would get in touch with him, and that Eckhart would be glad to have their support in his candidacy for the position of prohibition commissioner of Ohio (to be appointed by the Governor after the then pending election). Buckley thereupon arranged and was present at an interview between the attorneys and Eckhart, at which they retold their story (a confession of their client's crime but falsely minimized); Buckley expressed his opinion that the offense was not serious and Eckhart acquiesced and let them understand that there would be no criminal prosecution. [Eckhart denies this.] In the same conversation they assured Eckhart that they and their organizations would support him for his desired position and use their influence to get the Governor to appoint him. Buckley explained to these lawyers how great his campaign expenses were, and they expressed an intention to contribute in exchange "for what you have done for us." They went back to Cincinnati, reported to their clients that they had succeeded in averting any criminal prosecution and anticipated no serious action about the permit, collected a fee of $1,500 for their legal services, and sent $250 to Buckley to help out on his "postage." He took the money and put it into his campaign fund account.

The story, so far stated, is either Buckley's own or is left substantially undisputed when he testified as a witness for himself. Whether the extent of his participation, thus confessed, in this scheme, would be alone enough to support a prosecution is not directly involved; but it is pertinent to other features of the case.

When Schrimper brought this money to Buckley two or three days later, they had further conversation about "protection" for the Cincinnati breweries. Schrimper says: Buckley opened the subject by saying he understood the Cincinnati breweries were willing to pay $5 a barrel for protection; that this sum ought to be equally divided between the Cincinnati lawyers and Buckley; that he could arrange it with Eckhart so that Eckhart would notify him and he (Buckley) would notify Cincinnati in advance when raids or examinations were to be made; and that he (Buckley) out of his half of the protection money would take care of Eckhart. Schrimper indicated that his clients would join in this arrangement. Buckley

had him stay over night, they had "a few more drinks," and the next day Buckley told him that Eckhart had been seen and agreed. Schrimper telephoned the "good news" to Gruber and went back to Cincinnati.

Buckley says, in substance: This suggestion for protection and payment was the proposition of Schrimper; Schrimper said the amount of this one-half to me would probably run $300 per week; I said I did not think Eckhart would accept; the next day I told Eckhart of the offer to pay $300 a week for "protection" at Columbus; he first refused to have anything to do with it, and I told him I thought he would say that because he was "not that kind of a man"; I reported to Schrimper Eckhart's refusal. Eckhart says, in substance: On the first interview I told these people only that the matter of canceling the permit was for my superior, Mr. Woodruff, and that the matter of criminal prosecution was for the district attorney. A little later Buckley came to me and reported to me that Schrimper offered to pay for advance information as to raids at the rate of $2.50 per barrel, which money would be divided between Buckley and me, and I would get $300 a month; I expressed my surprise at any such proposition being made to me, or by him, and the impossibility of accepting it; he said he supposed I would take it that way. Finally, desiring full information as to what was going on in this line and to keep the thing open, I told him I would join in the plan and would tip him off in advance as desired. I immediately notified my superior, the director, and the assistant district attorney, and they advised me to get what evidence I could, which would show that Buckley was really proposing such a scheme; and whatever I did thereafter was following their advice. Accordingly I told Buckley (untruly) that the permit hearing was set for November 9th, and that inspections would be made in Cincinnati "next week." He wanted to know the exact date; I could not tell, but advised him "to notify them to stay in the clear all next week." He repeated his assurance of his political support and influence in my behalf. He was to keep me informed as to his whereabouts on a southern trip on which he was starting, and it was arranged that, as soon as I learned the day of the Cincinnati inspection, I would wire him, "I will meet you on Wednesday," or whatever the day might be. Accordingly, Buckley wired several successive addresses. I wired to the Chattanooga address, "Nothing definite"; to New Orleans, "Will meet you on Wednesday"; and to Little Rock,

"No meeting in Cincinnati for a week or ten days." Buckley acknowledged receipt.

Schrimper says Buckley before leaving on his trip arranged to wire him whenever word came from Eckhart; that from Chattanooga, Buckley, over a fictitious name, O'Brien, wired Schrimper, "Wire received this morning saying nothing definite on date of diagnosis * * * am in daily touch with physician"; that from New Orleans, over his own name, he wired Gruber, "Applicants examined Cincinnati Wednesday," and over the fictitious name, O'Brien, wired Schrimper, "Outside lawyers will examine papers Cincinnati Wednesday as they are on the way. Have briefs in good shape Wednesday morning"; and from Hot Springs, "There will be no meeting in Cincinnati for a week or ten days. This is the direct word received today from the judges."

Buckley concedes that he sent these messages; that their purpose was in each instance to convey the information he had received from Eckhart; that by "physician" and "judge" he referred to Eckhart; by "diagnosis," inspection; by "applicants," "papers," by "briefs," the breweries; and by "outside lawyers," inspectors, and that he adopted this cipher and the fictitious name for concealment. His explanation is that he supposed Eckhart was acting in good faith with the Cincinnati parties, and that, as a friendly act, he was willing to help Eckhart carry out the plan.

Thereafter there were three conversations between Buckley and Eckhart, each of which was partially recorded through a concealed dictagraph and a listening stenographer. In each of these Buckley was led to speak of the fact that he had kept the Cincinnati parties advised during his trip, to refer to and explain "the offer that you made me in your office that the Cincinnati breweries would pay me $300 a month for tips," or to make other general references and statements confirmatory of the existence of his deal with Schrimper and Gruber and emphasizing his ability and intention to get a state prohibition appointment for Eckhart. After all this, Buckley wrote to Governor Cooper a letter heartily indorsing Eckhart for the position of Ohio deputy prohibition commissioner (the commissionership having been otherwise filled), giving Eckhart's long experience and qualifications; speaking of "his fine record with the federal prohibition department," saying that "he is a man of splendid record in federal enforcement which bears no criticism," and that his selection for a similar position by the state of Ohio "ought to be an

asset for our state and for your administration." Buckley does not dispute these conversations, but explains them as he did the telegrams; and explains the letter to the Governor by saying, "I stay by my friends," although he had then believed for some weeks that Eckhart was dishonest.

Upon this state of the proof, the jury of course had the power to acquit Buckley; but that result would have been most surprising, and an impeachment of the jury's intelligence. The indictment charged him, Schrimper and Sperber (brew master), in the first eight counts, with offering to Eckhart a bribe of $300 per month, or of their political influence and support; and in the last two counts with conspiring to offer Eckhart these bribes. On Buckley's own theory that the schemes were Eckhart's and not his own, he was guilty of aiding and abetting and conspiring with Eckhart in the soliciting of bribes; and upon the record that theory is a mere appeal to credulity. With this background, we come to the question whether any error on the trial, if error there was, can fairly be considered as prejudicial, under section 269, Judicial Code (USCA tit. 28, § 391), or can require us to notice an error not assigned or properly preserved for review.

█ It is strenuously urged, although not suggested till after verdict, that the indictment states no offense because it charges an offer to bribe an "Acting Assistant Prohibition Director," while no such officer or person is known to the prohibition law or regulations. Even if this complaint were open, there is no merit in it. In all affairs, public and private, it must occasionally happen that some one is acting temporarily in place of the regular incumbent. Such an acting officer is plainly a "person acting * * * under or by authority of any department or office of the Government," etc. Section 39, Criminal Code; section 91, tit. 18, USCA; see Crinnian v. U. S. (C. C. A. 6) 1 F.(2d) 643. Further, the regulations expressly provide for the position held by Eckhart, though they do not use the word "acting" as part of an official title.

█ The first two assignments refer to rulings as to Eckhart's testimony. He had kept current notes and memoranda of his conversations with Buckley, and he used these in giving his testimony. The first assignment is that he was permitted to read these notes verbatim without first exhausting his independent recollection; and the second that defendant was not allowed to have the jury inspect these memoranda so as to see various suspicious appearances. Less definitely, it is complained that these memoranda should have been allowed to become an exhibit as part of the cross-examination, so that the jury might have them for complete observation. The record does not show that the witness did read from his notes rather than refer to them. It was the theory of the trial judge that the witness was merely referring to them to refresh his recollection, and the witness so stated. There is nothing definite to the contrary. When a witness is using his notes or memoranda for either purpose, and it is suggested that they contain additions, or changes, or are otherwise suspicious, we suppose it is good trial practice to permit them to be shown to and examined by the jury then and there. In this case, that was not allowed; but the notes were obviously in the hands of defendant's counsel for examination (the district attorney says for two days), and these counsel cross-examined at great length with regard to interlineations, changes, parts torn away, and apparently concerning every doubtful appearance. Eckhart conceded all these defects and explained them as best he could. It does not appear that the exhibition of them to the jury at that time would have added anything of value to the information which the jury had by hearing this examination. So far as there was a desire or request that the notes become exhibits, which might have been, in the end, taken to the jury room, it was rightfully disapproved. We cannot look with favor upon the trial practice which prevails in some states, whereby the pleadings and all exhibits are turned over to the jury during its final deliberation and where they may be considered without supervision or limitation. We conceive the approved federal practice to be that neither pleadings nor exhibits should go to the jury room unless, in the exercise of his discretion, the trial judge finds specific propriety therein. However, the whole matter here involved, the extent to which witnesses may refer to or read from memory refreshing memoranda, or their own contemporaneous records, and the extent to which such memoranda may be inspected by the jury is—usually if not always—a matter within the discretion of the trial judge. It is enough to say that here, in view of the exhaustive oral examination, this discretion was not abused, and that there is no reasonable possibility that the inspection of these notes by the jury would have been of any substantial service to it in deciding the issue of veracity.

█ Several assignments refer to the failure of the court to give defendant's requests to

the effect that a criminal intent was an essential of the crime. These requests were proper enough, and the court doubtless intended to give these instructions, though not in the language of the requests. His charge was that the crime was made up of three elements, each one of which must be found by the jury. These were, first, that there was an offer to bribe; second, that it was made to a person specified in section 39; third, that "the same was made to influence the officer or person in doing some act or the performance of some duty in his official capacity." Under the conceded facts of this case, there was no necessity for instructing as to criminal intent with the precision that would sometimes be appropriate. If Buckley offered a bribe, as testified to by Eckhart, the offer necessarily carried with it a criminal intent. If Buckley told the truth, no offer whatever was made by him. Under such circumstances, there is little room for controversy about criminal intent. Moreover, the essential criminal intent under this statute is nothing but the intent to influence the action of the officer in any matter of official duty before him, and this element of the crime was expressly stated by the judge in the instructions which he gave. Under the facts of this case, there is no substantial difference between saying that defendant must have a criminal intent and saying that the bribe which he offered must have been for the purpose of influencing the officer as to his official duty.

■■ The further specific criticism is made that the description of intent, as given in the above-quoted definition of the third element of the crime, does not exclude the purpose of influencing the officer toward the performance of his official duty. It is perhaps conceivable that money might be offered to a public officer to induce him to do his official duty and under such circumstances as not to be a bribe in the ordinary sense of that term; and one of the clauses of the statute is expressly limited to the purpose to induce the officer "to do or omit to do any act in violation of his lawful duty." Not so the earlier clause which prohibits such an offer, "with intent to influence his decision or action on any question, matter," etc. This clause does not seem to exclude an offer of a bribe made merely to accelerate or insure the performance of official duty; and if it does not, a charge to a jury is not necessarily erroneous because it fails to make the same exclusion. However, a charge is always to be interpreted in connection with the conceded facts of the case; and here there was no room for suggesting to the jury, nor would it have been entitled to consider, the idea that if Buckley made the disputed offer it was made with any purpose except to induce the nonperformance of duty. We are satisfied that any omission of a more formal charge on the subject of intent was without prejudice.

■ In our reference to this earlier clause of the statute, which specifies intent to influence the officer in his decision or action in any matter which is or may come before him, we do not overlook the fact that the indictment does not count upon this clause as definitely as it might; but the intent is plain enough to charge the giving of a bribe in violation of this section 39, and it was unnecessary for this particular intent to be stated any more specifically than is done by saying, after reciting Eckhart's official position and duties, "with intent to influence the said John F. Eckhart, as such officer and person acting as aforesaid." We consider this a sufficient indictment reference to the clause just mentioned—if any is needed.

■ Upon the subject of intent, our attention is also called to that portion of the charge which, in discussing the conspiracy counts and in defining the elements of this controversy, said that the defendants must be found to have entered into a combination "to commit an offense against the National Prohibition Act." The specific conspiracy charged was one to bribe Eckhart to violate his duty under the National Prohibition Act. The phrase used by the judge was a short cut, and an inaccuracy, which was doubtless inadvertent; but it could have misled no one. Not only was no objection or exception taken at the time, but the complaint has no substance.

■ It is fair to say that a defense much relied upon was entrapment, and several requests to charge on this subject were presented. The judge did not give them verbatim, but covered the subject in his own language. It is plain that, if the making of any offer of bribe by Buckley was induced or brought about by Eckhart, the defense of entrapment would have merit; and equally plain that, if Buckley first made the offer, without any inducement by Eckhart, then all the things which Eckhart afterwards did, in assuming to go along and in providing the way for Buckley to send incriminating telegrams and make incriminating admissions which would be overheard, were legitimate effort to get evidence which would tend to prove the crime which had already been committed.

Billingsley v. U. S. (C. C. A. 6) 274 F. 86, 89; Browne v. U. S. (C. C. A.) 290 F. 870, 873. These two alternatives were, in the charge, put clearly before the jury in a way and to an extent which leave no basis for complaint by Buckley.

Section 39 provides that the punishment for violation may include a fine of not more than three times the value of the thing offered. The fine imposed was $1,000. The thing offered in money was $300 per month for an indefinite period. We cannot say that the fine is excessive.

It is urged that all counts, including those for conspiracy, really were based upon one offense, so that it was wrong to impose separate sentences on counts 1, 2, 9, and 10. The imprisonment imposed under counts 2, 9, and 10 was in each case to be concurrent with that under count 1 and was less in time than that imposed under count 1. Hence, there was no prejudice, even if there had been only one offense—and this we do not intend to imply.

We have examined all the other assignments of error and points mentioned in the briefs, and find nothing requiring further discussion.

Many of the exhibits offered on the trial were copied into the bill of exceptions. We find, however, that the telegrams passing back and forth between Buckley and Schrimper or Gruber seem not to be so copied. The original telegrams, together with the other original exhibits, have been filed with the clerk and have been referred to by counsel without objection as if they were part of the record. We presume, therefore, either that they are incorporated in the bill of exceptions by some reference which we have overlooked, or that they were intended to be used as originals and as a part of the record. Accordingly an order will be made incorporating them into the record, but not requiring printing.

The record calls for another comment. It seems to be assumed in some districts that rule 10(1), requiring the testimony to be reduced to narrative form, means that it should be put into the third person. It does not. All condensation and narratives, unless for some special reason, should be put into the first person. The present record gives an extreme instance of the confusion and uncertainty resulting from trying to use the third person. Who is being referred to by "he" or "him" is a matter of surmise on almost every page.

The verdict and sentence are affirmed.