## LITTLE v. UNITED STATES.
### No. 1102.

Circuit Court of Appeals, Tenth Circuit.
Nov. 20, 1934.

Charles T. Mahoney, of Denver, Colo., for appellant.

Thomas J. Morrissey, U. S. Atty., and Ivor O. Wingren, Asst. U. S. Atty., both of Denver, Colo., for the United States.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

McDERMOTT, Circuit Judge.

Appellant was convicted of using the mails in execution of a scheme for obtaining money by false pretenses and promises. The scheme alleged was substantially this: That defend-

ant organized an unincorporated association called "Arriba Gold Fields, Ltd."; its authorized capital was twenty-five million shares of a par value of one dollar each. The defendant was the principal trustee. Defendant had an option to purchase 158 gold placer mining claims in New Mexico, which he proposed to transfer to the trust in consideration of $5,000 cash to the then owner—the purchase price under the option—and of 6,250,000 shares to defendant, for his bargain, when a mill of not less than 500 tons daily capacity was constructed. That defendant then, unknown to the shareholders, became a silent member of "David Garrett & Company, Investment Bankers," whose part was to dispose of the shares to the public for a commission, which the proof disclosed to be 60 per cent. of the gross proceeds. That defendant solicited the public to purchase such shares, and in so doing made false representations and promises, among them being that the placer claims contained an area of 40 square miles upon which there was in sight gold of the estimated value of $325,000,000,000; that such ore could be mined and milled for two dollars a ton; that there was plenty of wood and water available to operate the mills; that a 500-ton mill would be in operation by July 1, 1929; that the first unit was then being constructed; that the mine had passed from the speculative to the development stage, and would return good profits; that the trust was managed by conservative men of large caliber; that the Arriba was the world's greatest mine.

A further part of the scheme, as alleged, was to allay the uneasiness of shareholders in Arriba, when the original promises began to pall, by offering them stock in the Paradise Gold Mines Company which owned a bonanza discovered by three old French prospectors, who died without revealing its whereabouts. All of these representations were alleged to be false.

The letters set out in the indictment were mailed to the shareholders of the original Arriba trust, and explain that the delay in dividends had been caused by some unexpected litigation; an opportunity was offered shareholders to protect their interests in the Arriba mine and in water rights necessary to operate the mills, and at the same time give them "some real quick action," by buying stock in the Paradise Company—par value, one cent a share—to which would be conveyed the famous lost mine, over which the discoverers had dueled to their death, and which had been miraculously rediscovered in time to en-

able the Arriba shareholders to protect their interests in the claims with gold in sight of a conservative value of $325,000,000,000.

The proof disclosed a lurid appeal to the cupidity of the credulous. It was represented that the placer claims covered 40 square miles of conglomerate, which assayed from $1.00 to $45.00 a ton; that in one 160-acre tract there were more than 110,000,000 tons of ore exposed; that the cost of milling and mining would not exceed $2.00 a ton; that $3.00 a ton was a conservative estimate of the net profit to be derived from operations; from there simple arithmetic carried to the inescapable conclusion that the properties were conservatively worth $325,000,000,000. Other familiar indicia of this type of promotion were proven: Prospects were stampeded by the representation that a dead line had been established a few days hence, after which shares could only be purchased at a greatly enhanced price—a roving dead line which was advanced from time to time on account of mistakes of printers and by dint of overpowering arguments addressed to the trustees by the fiscal agents. The Homestake, the Cheno, and the Utah Copper mines, the fortunes amassed by Henry Ford and others, were referred to as the only standards, poor as they were, by which the pot of gold awaiting investors in Arriba shares might be measured. When Arriba did not promptly produce the promised dividends, shareholders were offered an opportunity to invest in the Endura Oil Company of Texas, and still later in the fabulous profits from the lost mine of the Paradise Company.

The defendant freely admitted the representations and promises, but stoutly maintained that he believed them to be true, and adduced reports of six men who signed as engineers, and ten who signed as assayers, attesting the truth of the representations. His testimony was that he formerly held a position of importance with the Southern Railway; he came west to manage some mining interests for a group of his fellow railroad employees. When that venture failed, he was stranded in Colorado. When the Arriba properties came to his attention, it sounded "ridiculously absurd" to him, but Garrett, a stock promoter who overheard the conversation, induced him to examine it, and the multitude of engineering reports convinced him; that his only profit from the transaction was a trifling salary, and his commissions on stock sales which had been lost, along with most of the moneys of the trust, in the oil proposition in Texas.

■ We first notice an untoward incident which occurred after the jury had commenced its deliberations, which may have grown out of an informal discussion in chambers, of which but a fragment appears in the bill of exceptions. It appears that the jury addressed a note to the judge, apparently asking for the indictment, certain exhibits, and a copy of the court's instructions. In the colloquy in chambers, defendant's counsel objected to the exhibits going to the jury and to any further instruction. The trial judge properly refused to act in chambers in the absence of the defendant; the jury was called in and the following proceedings had in court:

"The Court: Gentlemen of the jury, the court has your note asking for a copy of the indictment, which has already been furnished you, and your request for the letters pertaining to the different counts of the indictment. Is that correct?

"Foreman of the Jury: Yes, sir.

"The Court: And for the court's instructions. The court will direct the letters, which include enclosures and the letters pertaining to each indictment, sent up to the jury, and instruct the stenographer to attend in the jury room and read the instructions in their entirety from beginning to end, with no repetition of any part, or emphasis on any part, and, at the completion of the reading, to retire, to all of which exceptions will be saved. Is there anything more, gentlemen? If not, then you may retire.

"(And thereupon the court reporter went to the jury room and read the instructions to the jury.)"

Since the court saved an exception to the defendant in his order, it was not incumbent upon defendant to enter a formal objection as a predicate for another exception.

■ Whether the indictment or exhibits shall be taken to the jury room is within the sound discretion of the trial court;[1] if the indictment goes, the jury should be charged, upon request, that the indictment is not evidence of the facts charged therein.[2] There is no showing of abuse of that discretion here. But sending a stenographer into the jury room, there to read, in the absence of the defendant and his counsel, the charge of the court, stands in very different stead. No harm may come from it, it is true; but on the other hand, a mistake in the reading of a shorthand symbol which defense counsel would instantly detect, an unconscious or deliberate emphasis or lack of it, an innocent attempt to explain the meaning of a word or a phrase, and many other events which might readily occur, would result in irremediable prejudice to the defendant. Underneath that phase of it lies the proposition that no one should be with a jury while it is engaged in its deliberations. The jury system is founded upon the proposition that disinterested jurors will hear the evidence in open court, and upon that evidence and that alone, deliberate among themselves until a verdict is reached. Southern Pacific Co. v. Klinge (C. C. A. 10) 65 F.(2d) 85, certiorari denied, 290 U. S. 657, 54 S. Ct. 72, 78 L. Ed. 569. To permit various persons, under one pretext or another, to be with the jury in its deliberations is to open the door to grave abuse and to strike directly at the heart of the system. Without exception, as far as we are advised, such procedure has been held to be error. Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917; Kansas v. Brown, 22 Kan. 222; Stager v. Harrington, 27 Kan. 414; Du Cate v. Brighton, 133 Wis. 628, 114 N. W. 103; Hurst v. Webster Mfg. Co., 128 Wis. 342, 107 N. W. 666; Havenor v. State, 125 Wis. 444, 104 N. W. 116, 4 Ann. Cas. 1052; Kilgore v. Moore, 14 Tex. Civ. App. 20, 36 S. W. 317. Nor should there be any communication between the court and jury except in open court. Fillippon v. Albion Vein Slate Co., 250 U. S. 76, 81, 39 S. Ct. 435, 63 L. Ed. 853; Dodge v. United States (C. C. A. 2) 258 F. 300; Sargent v. Roberts, 1 Pick. (Mass.) 337, 11 Am. Dec. 185; Moseley v. Washburn, 165 Mass. 417, 43 N. E. 182; Whitney v. Com-

1 Winters v. United States (C. C. A. 8) 201 F. 845, certiorari denied, 229 U. S. 614, 33 S. Ct. 773, 57 L. Ed. 1352; Lefkowitz v. United States (C. C. A. 2) 273 F. 664, 667; Petersen v. United States (C. C. A. 9) 287 F. 17; Rumely v. United States (C. C. A. 2) 293 F. 532, 557, certiorari denied, 263 U. S. 713, 44 S. Ct. 38, 68 L. Ed. 520; Silkworth v. United States (C. C. A. 2) 10 F.(2d) 711, certiorari denied, 271 U. S. 664, 46 S. Ct. 475, 70 L. Ed. 1139; Buckley v. United States (C. C. A. 6) 33 F.(2d) 713; Caldwell v. United States (C. C. A. 10) 36 F.(2d) 738, certiorari denied, 281 U. S. 725, 50 S. Ct. 239, 74 L. Ed. 1143; Capriola v. United States (C. C. A. 7) 61 F.(2d) 5, certiorari denied, 287 U. S. 671, 53 S. Ct. 315, 77 L. Ed. 579; Norcott v. United States (C. C. A. 7) 65 F.(2d) 913, certiorari denied, 290 U. S. 694, 54 S. Ct. 130, 78 L. Ed. 597.

2 Capriola v. United States (C. C. A. 7) 61 F.(2d) 5, certiorari denied, 287 U. S. 671, 53 S. Ct. 315, 77 L. Ed. 579.

monwealth, 190 Mass. 531, 77 N. E. 516; State v. Costales, 37 N. M. 115, 19 P.(2d) 189; Buntin v. Danville, 93 Va. 200, 24 S. E. 830.

The District Attorney very properly concedes the rule to be so. His answer is that the error does not require a reversal and directs attention to the cases last cited, in some of which it was held that where the communication was in writing and unchallenged, a judgment need not be reversed if it affirmatively appears that the communication was harmless. But where an outsider is present in the jury room during its deliberations, a different situation is presented. What went on cannot be determined by examining an undisputed writing, but can only be ascertained by exploring the deliberations of the jury room, a procedure adopted only in extreme cases and then reluctantly. No case is cited holding that the presence of an outsider in the jury room during its deliberations was harmless error, although it was held in Miller v. State, 13 Ga. App. 440, 79 S. E. 232, that the defendant might waive his right to object. In the case at bar, the record is silent as to what occurred in the jury room. There is nothing therefore in this record to support a finding, affirmatively made in the cited cases, that the error was necessarily harmless.

The Supreme Court of the United States, the Eighth Circuit Court of Appeals, and the Supreme Court of Kentucky, in ruling upon occurrences very similar to the one under examination, have used blunt language pertinent here. In Mattox v. United States, 146 U. S. 140, 150, 13 S. Ct. 50, 53, 36 L. Ed. 917, the bailiff discussed the case with the jurors in his charge, and a newspaper account of the trial entered into the deliberations in the jury room. The conviction was reversed, the court, speaking through Mr. Chief Justice Fuller, saying:

"Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

In Fillippon v. Albion Vein Slate Co., 250 U. S. 76, 81, 82, 39 S. Ct. 435, 436, 63 L. Ed. 853, the trial judge sent an additional written instruction to the jury, at its request. The Supreme Court said:

"Where a jury has retired to consider of their verdict, and supplementary instructions are required, either because asked for by the jury or for other reasons, they ought to be given either in the presence of counsel or after notice and an opportunity to be present; and written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object. Under ordinary circumstances, and wherever practicable, the jury ought to be recalled to the courtroom, where counsel are entitled to anticipate, and bound to presume, in the absence of notice to the contrary, that all proceedings in the trial will be had. In this case the trial court erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction. * * * And of course in jury trials erroneous rulings are presumptively injurious, especially those embodied in instructions to the jury; and they furnish ground for reversal unless it affirmatively appears that they were harmless."

In Kokas v. Commissioner, 194 Ky. 44, 237 S. W. 1090, 1093, the court sent the stenographer into the jury room to read from his notes a part of the trial proceedings. The conviction was reversed, the court saying:

"In the face of so grave an error as that committed by the trial court in this case, the appellate court should not stop to weigh probabilities, or try to discover from the record whether it was prejudicial to the accused, but must assume that the error amounted to such an invasion of appellant's constitutional rights as to deprive him of a fair and impartial trial."

In Chambers v. United States (C. C. A. 8) 237 F. 513, 521, the bailiff advised the jury of the penalty prescribed for the offense which they were trying. Judge Walter H. Sanborn, for the court, said:

"The opinions in these and other cases have been read and considered, and the conclusion is that the stronger reasons and the weight of authority sustain the rule that, where a motion for a new trial is made on account of communications to the jury during their deliberations, there is a rebuttable legal presumption that they were prejudicial to the moving party, that this presumption may in some cases be overcome by evidence, and that where competent evidence is offered it is the duty of the trial court to hear and consider it, and that when it does so, and decides the motion thereon, its decision is discretionary, and is reviewable by a federal appellate court for abuse of discretion only."

■■ These cases were decided before the amendment of February 26, 1919 (40 Stat. 1181), to section 269 of the Judicial Code (28 USCA § 391). That amendment reads:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

It is contended that this amendment puts upon an appellant the burden of proving that prejudice in fact resulted from errors assigned, and that it in effect reverses all prior decisions of the Supreme Court of the United States and the inferior courts on the point. It is true that since that amendment some courts have said that an appellant must establish affirmatively both substantial error and resulting prejudice. Among them are Marron v. United States (C. C. A. 9) 18 F. (2d) 218, affirmed on other grounds, 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231, where evidence erroneously admitted was afterward withdrawn; United States v. McCann (C. C. A. 2) 32 F.(2d) 540, certiorari denied, 280 U. S. 559, 50 S. Ct. 18, 74 L. Ed. 614, where evidence erroneously admitted was on a point covered by competent evidence; Rice v. United States (C. C. A. 2) 35 F.(2d) 689, certiorari denied, 281 U. S. 730, 50 S. Ct. 246, 74 L. Ed. 1146, where counsel made statements to which no objection was made; Miller v. United States (C. C. A. 9) 47 F.(2d) 120, denial of bill of particulars; Matchok v. United States (C. C. A. 3) 60 F.(2d) 266, sentence not technically accurate; Goldstein v. United States (C. C. A. 8) 63 F.(2d) 609, objectionable statements of court to counsel.

On the other hand, it has been held that the amendment merely restated the ancient doctrine of harmless error, and that the rule announced by the Supreme Court of the United States in the Mattox and Fillippon Cases has not been reversed by Congress. Among them are Sunderland v. United States (C. C. A. 8) 19 F.(2d) 202, where a juror discussed the case with a government witness; Eierman v. United States (C. C. A. 10) 46 F.(2d) 46, Coulston v. United States (C. C. A. 10) 51 F.(2d) 178, Gold v. United States (C. C. A. 2) 26 F.(2d) 185, Nicola v. United States (C. C. A. 3) 72 F.(2d) 780, 783, where incompetent evidence was erroneously admitted; Fina v. United States (C. C. A. 10) 46 F.(2d) 643, where supplemental instructions were given in the absence of a defendant in custody. These cases were all decided after the amendment of 1919, and in each a verdict was set aside because it did not affirmatively appear that no prejudice resulted from the error.

The language of the amendment is not obscure in this regard. It enjoins upon appellate courts the duty to disregard "errors * * * which do not affect the substantial rights of the parties." That is to say, if an examination of the entire record discloses that an error did not affect the substantial rights of the parties, it should be ignored. That is the doctrine of harmless error, evolved by the courts long before the amendment. It will be observed that the statute does not say that a substantial error must be ignored unless the appellant establishes prejudice; on the contrary, it speaks only of errors which the record discloses do not affect substantial rights. It is in exact accord, and not in opposition, to the rule announced by the Supreme Court in the cited cases.

While the language used by the courts cannot always be reconciled, it is believed their decisions may be. In some of the cases where the appellant was said to be under the burden of proving prejudice, the courts pointed out that the record disclosed the error was harmless. Where the record affirmatively so discloses, no question of burden of proof arises. In some the error was so inconsequential and the chance of its having any influence upon the jury so remote, the court declined to consider it unless there was some showing that prejudice did result. On the other hand no case has been cited, before or since the amendment, where substantial error occurred which, within the range of a reasonable possibility, may have affected the verdict of a jury, where the appellant was required to prove that it did influence the action of the jury. In Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674, 90 A. L. R. 575, on appeal from a state court, the court merely held that due process did not prohibit a view of the premises in the absence of the defendant; and even there, the court pointed out that the record affirmatively disclosed that no harm could have come from the incident.

We conclude that where the entire record affirmatively discloses that an error has not affected the substantial rights of an appellant, it will be disregarded. But where error occurs which, within the range of a reasonable possibility, may have affected the verdict of a jury, appellant is not required to explore the minds of the jurors in an effort to prove that

it did in fact influence their verdict.[3] So to hold would, as a practical matter, take from a defendant his right to a fair trial. In this case we know nothing of what went on while the stenographer was in the jury room; it is entirely possible that a shorthand character was misinterpreted; emphasis plays an important role in transmission of ideas by word of mouth, and the difficult injunction of the court to avoid any emphasis is no assurance that there was none. What else may have occurred, we do not know. No outsider has any business in the jury room; much harm could result, and that is enough. The record failing affirmatively to disclose that no prejudice did result, the verdict cannot stand.

 Of the many other errors assigned, but three are presented in the briefs, and are all that warrant consideration. The trial court declined to hear evidence as to the mines acquired and operated by the Paradise Company in Colorado, long after the indictment letters were mailed. The court properly ruled that if the letters were mailed in execution of a scheme to defraud, it was no defense that thereafter the company was successful in that or other ventures. But the question of the good or bad faith of defendant when the letters were mailed was a critical issue of fact. Events occurring after the letters were mailed might shed light upon the intent of defendant when the letters were mailed. Or they might not. There being no offer of proof, we cannot tell whether the evidence sought to be adduced was so remote or unconnected with the alleged scheme as to throw no light upon the intent of defendant when the letters were mailed. Where a specific intent is an essential element of a crime, evidence which sheds any light upon a question so difficult of exact proof as a state of mind, is admissible.

 The court charged the jury that in order to convict, they must find beyond a reasonable doubt that defendant mailed the letters in execution of a scheme to defraud. He declined upon request to charge the converse, that if the letters were not sent in execution of the scheme charged, they should acquit. He also declined to charge that if the scheme had ended before the letters were mailed, there should be an acquittal. McNear v. United States (C. C. A. 10) 60 F.(2d) 861; Armstrong v. United States (C. C. A. 10) 65 F.

(2d) 853. If, upon the proof adduced upon another trial, a reasonable man might conclude the scheme had ended before the letters were mailed, a charge embodying that theory of the defense should be given. A charge that if the jury fails to find the essentials of the crime charged, there should be an acquittal—the converse of the charge given—puts to the jury the defendant's side of the case and, when requested, should be given.

 Since the evidence upon another trial may not be the same as upon this trial, a microscopic examination of this record is not necessary to determine whether defendant was entitled to a directed verdict. It may be said, however, that the gist of the offense is the use of the mails (Armstrong v. United States, supra); if the mails were used in execution of a fraudulent scheme, it is no defense that the scheme was formed and partially carried out back of the statute of limitations. Proof running back of the statute is admissible provided it is connected up with the scheme existing when the letters were mailed. Likewise of proof of the Endura Oil Company and the Paradise Company: Although these might not have been a part of the scheme as originally designed, if the scheme broadened to embrace them, evidence thereof is admissible to establish the scheme as it existed when the letters were mailed. There was proof of extravagant representations as to the fortunes to be made from this development, but we do not find proof of their falsity. For aught this record discloses, there may be a conglomerate in New Mexico, of the extent represented, with a low grade mineral content as certified by the assayers. It sounds fantastic, but it is a matter of common knowledge that sea water is impregnated with gold. If the flaw in this bubble was, as we suspect, that the cost of recovery exceeds the value of the minerals recovered, there should be proof of that fact. Courts and juries cannot juristically notice that the opinions of those signing as engineers, as to cost of recovery, are false. There was water on the claims as represented; if there were prior adverse claims thereto, that should be shown as well as defendant's knowledge of that fact. The extent of the minerals, the facilities for and expense of recovery, are the major representations upon which the money of investors was obtained,

---

[3] In Snyder v. Massachusetts, 291 U. S. 97, 113, 54 S. Ct. 330, 335, 78 L. Ed. 674, 90 A. L. R. 575, after finding that no prejudice resulted from defendant's absence when the scene of the crime was viewed, the Supreme Court held that "the least a defendant must do * * * is to show that in the particular case in which the practice is exposed to challenge there is a reasonable possibility that injustice has been done."

and which are stressed here as proof of guilt. If they were false, proof thereof should be easily obtainable. If they were false, a jury would be warranted in finding they were fraudulently made. Representations that the venture was not speculative, that it was the world's greatest mine, that the trustees were conservative and big men, would afford little support for a conviction if the representations as to the extent of the ore and the cost of recovery were true.

The judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.