## GREAT NORTHERN RY. CO. v. TAULBEE.*

### No. 8236.

Circuit Court of Appeals, Ninth Circuit.

Aug. 30, 1937.

Rehearing Denied Oct. 4, 1937.

*Writ of certiorari denied 58 S.Ct. 476, 82 L.Ed. —.

T. B. Weir, W. L. Clift, and Harry P. Bennett, all of Helena, Mont., and A. F. Lamey, of Havre, Mont., for appellant.

A. H. Angstman, Lester H. Loble, and Hugh R. Adair, all of Helena, Mont., for appellee.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

MATHEWS, Circuit Judge.

Appellee's intestate, Russell L. Taulbee, was killed in a collision between appellant's locomotive and an automobile driven by Taulbee at a point where appellant's railroad crosses the public highway at or near a station called Wiota, in Valley county, Mont. As administrator of Taulbee's estate, appellee, a citizen of Montana, brought this action to recover damages of appellant in the sum of $50,000, alleging that Taulbee's death was caused by appellant's negligence. The action was commenced in a state court of Montana, but, on petition of appellant, a citizen of Minnesota, it was removed to and tried in the District Court of the United States.

Appellee's complaint alleges that appellant negligently (1) caused Taulbee's view of its railroad track to be so obstructed that he could not see appellant's locomotive as it approached the crossing, (2) failed to place a flagman or signalman at the crossing, or to install and maintain there an automatic gong, bell, or other signal or device, to notify Taulbee of the approach of

appellant's locomotive, (3) failed to sound the whistle and bell of its locomotive as it approached the crossing, and (4) ran its locomotive at an excessive and dangerous rate of speed; and that these negligent acts caused the collision.

Appellant's answer denies these allegations and alleges that the collision was caused by Taulbee's own negligence. As a second defense, the answer alleges that Taulbee was guilty of contributory negligence in failing to stop, look, or listen for approaching trains before driving his automobile onto the crossing.

At the close of all the evidence appellant moved the court for a directed verdict in its favor, on the grounds, among others: (1) That the acts of negligence charged in the complaint had not been proved, (2) that the evidence showed the collision to have been caused by Taulbee's own negligence, and (3) that it showed Taulbee to have been guilty of contributory negligence. The motion was denied. The jury returned a verdict in appellee's favor for $16,500. Judgment was entered accordingly. This appeal followed.

Appellant assigns as error the denial of its motion for a directed verdict. Appellee says this ruling was not excepted to and is, therefore, not reviewable. True, the bill of exceptions does not state, in direct and positive language, that appellant excepted to the court's ruling, but it does show presentation of appellant's motion and, immediately thereafter, the following:

"The Court: Motion is denied. Exception noted."

This form of expression is objectionable and should not have been used. If appellant did, in fact, except to the ruling, the bill should have so stated, instead of merely stating that an exception was "noted." If appellant did not, in fact, except to the ruling, then there was no exception, and none should have been "noted."

In a federal court, a litigant must take his own exceptions. The court cannot take them for him or dispense with the taking of them. A federal court cannot properly "note" an exception to a ruling unless the litigant against whom the ruling was made has, in fact, excepted to it. Since the court has in this case "noted" an exception to the denial of appellant's motion for a direct-ed verdict, it should be presumed, not that the court acted improperly, but that the exception thus "noted" was, in fact, taken. Indulging this presumption, we hold, notwithstanding the inapt language of the bill, that the ruling complained of is properly before us for review. Compare Long v. Atlantic Coast Line R. Co. (C.C.A.4) 238 F. 919, 922; Routzahn v. Petroleum Iron Works Co. (C.C.A.6) 56 F.(2d) 938, 939; Little v. United States (C.C.A.10) 73 F. (2d) 861, 864.

The evidence establishes, without conflict or dispute, the following facts:

At the crossing where the collision occurred, appellant's railroad runs approximately east and west. The highway runs approximately north and south. Besides its main line track, appellant has two other tracks running parallel to its main line. One, called the north passing track, crosses the highway at a point 49.25 feet north of the main line crossing.[1] Another, called the south passing track, crosses the highway at a point 16.2 feet south of the main line crossing.

About 390 feet east of the highway, between the main line track and the north passing track, there is, or was at the time of the collision, a building used by appellant as a depot. Between the highway and the depot, the ground between the main line track and the north passing track, though not a public highway, was used by the public, with appellant's knowledge and consent, as a roadway leading to and from the depot; the depot being otherwise inaccessible to the public.

On the north side of its main line track, about 90 feet west of the highway, appellant has a water tank, the upper part of which is cylindrical in form. The lower part, or base, is of octagonal shape, is boarded up on all sides, and has the appearance of a solid structure. The tank has a total height of about 30 feet and a width or diameter of about 22 feet. The south edge of the tank is 11.68 feet from the center of the main line track.

Traveling south on the highway toward the main line crossing, one's view of the track west of the crossing is obstructed to some extent by the water tank just described. Thus, from a point in the center of the highway 30 feet north of the center of

---

[1] This distance is from center to center of the tracks referred to. Between the south rail of the north passing track and the north rail of the main line track, the distance is 44.55 feet.

the main line crossing, one driving south on the highway has an unobstructed view of only 160.9 feet of the main line track west of the crossing. From a point 25 feet north of the crossing, his view of the main line track west of the crossing is unobstructed for a distance of 184.5 feet. From a point 20 feet north of the crossing, his view is unobstructed for a distance of 236.2 feet. From a point 15 feet north of the crossing, his view is unobstructed for a distance of 444.1 feet.[2]

Prior to the time of the collision, appellant had placed some freight cars on its south passing track. The freight cars were there at the time of the collision, but, being on the south passing track, they could not and did not obstruct the view of the main line track by one approaching the crossing from the north.

Wiota is not a city or town. It is merely a railroad station. The crossing in question is a "country crossing." Appellant has never stationed a flagman or signalman there, nor has it constructed or maintained an automatic gong, bell, or other automatic signal to warn travelers on the highway of the approach of its locomotives or trains. It has at all times maintained two upright posts, one a few feet east of the highway and north of the north passing track, and the other a few feet west of the highway and south of the south passing track; each bearing the usual pair of cross-arms, indicating a railroad crossing. Taulbee was familiar with the crossing.

On the morning of April 16, 1934, Taulbee, accompanied by three other persons, drove his automobile south on the above-mentioned highway, crossed the north passing track, turned off the highway to his left, and drove east, between the north passing track and the main line track, to a point about halfway between the highway and the depot. There Taulbee discharged his passengers. He then turned his automobile round and drove west, back to the highway, re-entering it at a point about 20 feet north of the main line crossing. From that point he drove south on the highway, without stopping, until he reached the crossing. There his automobile was struck by the locomotive of an eastbound train on appellant's main line track, and he was instantly killed.

This happened in clear daylight at about 7:05 o'clock a. m. From the time it re-entered the highway until it was struck by the locomotive, Taulbee's automobile was traveling at a speed of between 6 and 7 miles an hour, which is to say, between 8.8 and 10.27 feet a second. The locomotive was traveling at a speed of between 55 and 60 miles an hour, which is to say, between 80.67 and 88 feet a second.

Demonstrably, therefore, when Taulbee's automobile was 20 feet from the crossing, the locomotive was within 200 feet thereof and was in plain view of Taulbee. If he did not see it, it was because he did not look. His view of it was wholly unobstructed. If he had looked, he could have seen the locomotive and could have stopped his automobile in time to avoid the collision. Failing to do so, he was guilty of negligence. Compare Baltimore & Ohio R. R. v. Goodman, 275 U.S. 66, 69, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645; Pokora v. Wabash Ry. Co., 292 U.S. 98, 102, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A. L.R. 1049.

Whether or not appellant also was negligent, or whether its negligence, if any, concurred with Taulbee's in causing the collision, it is unnecessary to decide. Taulbee's negligence, if not the sole cause, was at least a proximate cause of the collision. Whether it was the sole cause, or was a concurrent cause amounting to contributory negligence only, is immaterial. In either case, recovery is barred.

Appellant's motion for a directed verdict should have been granted.

Judgment reversed.

GARRECHT, Circuit Judge (dissenting).

The ruling of the court on the motion for a directed verdict was not excepted to and is therefore not reviewable. As pointed out in the majority opinion, the bill of exceptions does not state that appellant excepted to the court's ruling. All that appears is that the court "noted" an exception, but, as the opinion correctly says, "A Federal court cannot properly 'note' an exception to a ruling unless the litigant against whom the ruling was made has, in fact, excepted to it." This alone should dispose of the appeal.

To avoid this rule the majority opinion seeks to establish a presumption by indulging an exquisite casuistry not supported by the facts.

---

[2] All these distances are from the center of the main line crossing.

Appellant, in its reply brief, does not contend that it asked for an exception to the ruling of the court denying its motion for a directed verdict, but insists that the mere statement of the court, "Motion denied. Exception noted," is sufficient. But, as the majority opinion says: "In a federal court, a litigant must take his own exceptions. The court cannot take them for him or dispense with the taking of them." In the face of appellant's tacit admission, to indulge in presumptions seems out of order.

In any event the ruling of the court on the motion was manifestly right and we will now examine the evidence which sustains the correctness of the ruling.

Where the evidence is conflicting the case is for the jury. The majority opinion disregards this salutary rule. The conclusion reached can only be arrived at by utterly disregarding the evidence for the plaintiff. No sound principle of law permits an appellate court to do this.

Ordinarily, and unless so evident that fair-minded men could not differ in regard thereto, negligence or contributory negligence is not a question of law but of fact to be settled by the findings of the jury. Richmond & Danville R. R. Co. v. Powers, 149 U.S. 43, 13 S.Ct. 748, 37 L.Ed. 642; Texas & Pacific Ry. Co. v. Harvey, 228 U. S. 319, 33 S.Ct. 518, 57 L.Ed. 852.

The majority accepts without question and relies upon the maps, photographs, blueprints, and figures supplied by the engineer in the employ of the defendant company, notwithstanding the fact that these were not made or taken or prepared until long after the accident happened and after changes and alterations had taken place or been made in and about the premises.

This witness admits that conditions were not the same as on the date of the accident which was April 16, 1934. His testimony in this regard was:

"I said that this represents the yard layout and conditions on April 16, 1934. I took these conditions from checking the files in the St. Paul office, against the conditions in the field.

"The records in the St. Paul office were not made on this date, nor the data collected on April 16, 1934. They were made prior to that date, at different periods. The last correction was made—the map was revised in May, 1934. Yes, I believe that is after the accident.

"Some of those conditions I am showing on there would be conditions that are prevailing a considerable time subsequent to the happening of the accident, but they checked with this map. I didn't make any actual measurements on April 16, 1934.

"This map is drawn from data that was collected at different times long prior to April 16, 1934, and my notes taken in the field. By 'my notes taken in the field' I mean the survey I made at Wiota in October, 1934. I examined conditions respecting these measurements in October 1934, and checked it against the yard map. By 'checking against the yard map', I mean the yard map I made in my own way.

"There have been changes made from time to time in the yard. * * * "

"These measurements I made on these plats were made from field notes which I checked in October, 1934. I didn't take those in April 1934, the month of the accident, because I wasn't there in April.

" * * * The depot isn't there any more now. It is on the other side, south side, of the track. * * *

" * * * They had graded to the west, and that is why I didn't show the old road. I couldn't show the old road for that reason.

"The depot now is closer to the crossing than it used to be. * * *

"It wouldn't necessarily follow that the center line of the road would depend on the width of the road, whether this had been widened to the east or west. It could follow if they made the road wider and pushed it east and left the west line the same. In my testimony I am confining myself to what I found there, and considering the crossing in the center of the road."

This witness having shown that these changes had been made, the court declined to admit the photographs and blueprints. Later the appellant produced its claim agent whose testimony was deemed sufficient to permit the admission of the exhibits. His testimony was as follows:

"I made an investigation of the scene of the accident that occurred at Wiota the morning after it occurred, which was April 17, 1934. I was there subsequently with Mr. Nolting, at the time he made certain measurements. That was in September, 1935.

"There were no changes or differences in the condition as to the tracks and locations, and so forth, shown as Nos. 1, 2, 3, 4

and 5, or of the water tank, or the crossing, or the standpipe, as shown on Defendant's Exhibit 1, at the time I was there with Mr. Nolting, than at the time this accident occurred."

This, it must be noted, is not only in conflict with what the engineer had stated but is flatly contradicted by the plaintiff's witnesses. The testimony of James L. Taulbee was as follows:

"I visited the scene of the accident at Wiota first on April 17, 1934, and also made a subsequent visit there, which was sometime in August. * * *

"I made an examination of the crossing there, between the water tank and where the depot buildings were, on that second visit. I found changes in the crossing over what I had viewed on the first visit on the 17th of April, 1934. * * *

"In the crossing itself, it was widened—that is, the fill. It was widened and smoothed up to where the depot had stood. * * *

"Q. Did you observe any indications as to where those buildings had been in August, when you were there? A. I could not detect exactly where they had been, it had been filled up so much, but I had a knowledge, having viewed it when I was there, of approximately where it was, but that depression in there had all been filled out, or nearly so."

Mr. Shane, who was a conductor and present at the time and saw the accident, when on the witness stand was shown the map prepared by appellant's engineer, and on being asked, "Is that substantially a drawing of the layout?" answered: "This would look to me as if this track (indicates), should come over and start to curving, and one down from here (indicates), and then there is a connection track and that is where the equipment stood, and we backed that out on the crossing, therefore, I wouldn't say it was very accurate." And again:

"Then, at the time of us working out here (indicates); they made some changes now. This track (indicates), would come closer and come over this loading crossing out here (indicates), and then turn, and then there is a switch from here to here (indicates), and that comes out on the wye. * * *

"Up in here (indicates), this track comes down this way (indicates), and this track here (indicates), instead of coming away down here (indicates), comes along in this way (indicates), to meet that track (indicates), and your wye is here (indicates), and right in here (indicates), is a crossover which makes your wye and you go in this way (indicates), and back up and turn your engine, and when we pulled out of here (indicates), we were right on this crossing to load our passengers, and that is what I say, this is away off, according to my idea."

There is also contradiction and confusion as to whether or not warning signals were given by the train as it approached this crossing. The conductor of the train being operated on the Government's railroad, and defendant's station agent, testified that they heard no signals either of whistle or bell.

True, the train crew insisted that the engine whistle was blown and the bell rung. Anyway, there was conflict in the evidence.

In this station yard there were in close proximity with one another four tracks and a stub track or siding on which some cars were standing near the water tank on the day of the accident. There was much activity going on about this station and in the vicinity of the crossing on that particular morning.

Another train crew was operating at the time with some cars on another track at a short distance away. Some of the servants of appellant who were on this train were also witnesses.

Patrick Ruddy, carpenter helper, testified:

"I heard two or three whistles that morning. I never kept track of them. It wasn't unusual to hear whistles down there; you hear whistles down there all the time. There were other engines in the yard at that time. Mr. Merwin's engine was there. I heard that whistle. Then there was the engine on the Wiota special there that morning.

"I saw 28 as it went by the outfit car. It was, oh, a couple of minutes before that, that I heard this first whistle. I heard two blasts, two or three. It was a couple of minutes before I saw 28 pass the outfit car that I heard the last whistle. * * *

"I couldn't tell from where I was sitting in this outfit car, where I couldn't see 28, whether it was Mr. Merwin's engine, or whether it was Mr. Shumacher's engine on

28, that blew the whistle, except it was right close to the time that train went by, after the train followed up the whistle. It was about two or three minutes after. I couldn't say whether Mr. Merwin's crew were over there in their engine at that time. I didn't see them; not at that time."

Martin Matson, the bridge and building foreman for the appellant, "heard the station whistle and also the crossing whistle." He could not say he heard any bell. He was inside of the coach and did not see the engine or train. He also testified:

"I couldn't say how long it was after I heard the crossing whistle, before this No. 28 went by my coach the first time, and by the Wiota station. My idea would be about 3 or 4 minutes; three minutes.

"It was one minute between the station whistle and crossing whistle, I would say."

If we are to accept the method of measurement and calculation submitted by defendant's engineer who prepared the maps and blueprints, it is demonstrable that at the rate the train was traveling it was three or four miles away when Ruddy and Matson say they heard the sound of the whistle; most likely, what they heard then was Merwin's train that was switching about the yard a short distance from the crossing on another track, and not the train on the main line which killed Taulbee. At least this was a reasonable inference that a jury might draw from all the evidence.

· Plaintiff's testimony was to the effect, and defendant's photographs tended to establish, that the water tank was so situated as to hide from a traveler on this depot roadway the view of any train approaching from the west on the main line track. It was a place of danger to the general public, particularly to those about to pass over this much-used crossing. Defendant had made provision to obviate or minimize this danger by its Rule No. 103: "Agents and operators, while on duty, are required to protect public crossings in the vicinity of their stations against passing trains that do not stop. For this purpose, a yellow flag will be used by day and yellow light by night." In this connection the agent in charge of the station testified: "I did not protect this crossing either by a yellow flag or a yellow light."

The majority opinion also adopts without question all of the calculations based on these maps and blueprints which assume that all the changes that were made after the accident and before the photographs and maps were made left the situation the same as on the day of the collision. All of which was disputed by evidence of the plaintiff. According to appellant, this tank, 30 feet in height and 22 feet in width, constructed from the ground to the roof of boards and standing close to the track, never offered any substantial obstruction to prevent the driver of the car from seeing an approaching train. Plaintiff's testimony tended very much to establish the contrary. One witness testified:

"I made observations to determine how much I could see of the main line track, looking in a westerly direction, while down in the depression where this road was, between this main line track and the siding track, but you would have to let me explain a little.

"When facing the water tank, the distance I could see down the railroad would depend altogether on how close I was to the tank.

"When I stayed back close to the depot [almost 500 feet from the tank], I could see the rails of the main track some little distance, maybe a hundred or maybe two hundred feet, but as I got down toward the water tank, I couldn't see so much, and as I approached toward the crossing, I saw still less. That is about the only way I can tell you.

"The Court. Q. What did you see, if anything, when you got to the crossing on the railroad tracks? A. Virtually nothing.

"The obstruction that interfered with my vision or view of the main line track, was the water tank."

The coroner who viewed the premises on the day of the fatal accident testified:

"At the center of the road, I couldn't see nothing—no further than the water tank. * * *

"I testified to certain observations. I made one from where the body was. I couldn't see anything beyond the water tank from that point."

Perhaps more significant still was the testimony of appellant's fireman, who was on the engine that collided with decedent's car. He was looking out of the window on the side from which the driver of the automobile approached the crossing. While on the stand for defendant he said:

"This morning when I jerked my head in as we went by the water tank, I looked right out of the window in front end of the engine. With reference to where I was sitting on the seat box, that window is right in front of the seat box, probably three or four feet ahead of the seat box."

"Before we hit this crossing, I couldn't see any automobile of any kind, or any part of any automobile, on account of this water tank. * * *"

Furthermore, the evidence indicates that decedent acted at once to save himself. By the impact the rim and tire of the right front wheel of Taulbee's automobile were torn off and were driven against the depot 390 feet away with such great force that the impact caused the clock in the station to stop. This would tend to prove that decedent immediately upon seeing the approaching train attempted to steer his car away from the danger, but the engine traveling at this great speed at this crossing was upon him before he could escape.

In Hires v. Atlantic City R. Co., 66 N.J. Law, 30, 48 A. 1002, the court held: "That, if a steam-railroad company creates extraordinary danger at a highway crossing, it must use extra precautions to give notice of approaching trains. [Citing cases.] * * * Because of these conditions, resulting from the location and construction of the tracks and the use made by the company of the embankment, the view of approaching trains by persons traveling north on the highway was obstructed more than is usual at highway crossings, and therefore a proper case was presented for submitting to the jury the question whether the company owed to the public the duty of giving extra warning against danger."

The conflicting testimony and the varying views of witnesses as to physical conditions surrounding the accident made the questions of negligence and contributory negligence clearly for the jury to determine. They may have attached little weight to these photographs, blueprints, and maps made seventeen months after the happening of the accident, after the widening and regrading of the crossroad, the alteration of the railroad crossing, and after the change in the location of the depot from the north to the south side of the main line track, which change also resulted in the abandonment of this very road in the hollow between the two tracks over which the decedent had to travel just before he was killed.

Most of the photographs, blueprints, and the mathematical calculations which are presented as exhibits only serve to confuse the issues. The evidence establishes that decedent was not at these places on the morning of the accident. At other places over which he did pass which are likewise the subject of elaborate figures, it is conclusively established that at no time while decedent was on these roads in question had the train arrived at these points claimed to be within the vision of the driver, because, traveling 88 feet per second, the train would have traveled from any of these places and passed the crossing before decedent would have arrived there.

Moreover, the photographs, blueprints, and maps relied upon to establish the distances make use of a point in the center of the highway. Usually a driver keeps to the right of the center line. This would make a very considerable difference in the viewpoint of the man in the automobile.

A glance at the blueprints also shows that there is a stationary ladder at the side of the tank which would very materially interfere with the view of the driver of the car. This obstruction is likewise disregarded in the calculations on the map.

By rejecting and disregarding the evidence for plaintiff and accepting without question defendant's mathematical speculations based on these questionable exhibits, the majority conclude that when the decedent's "automobile was 20 feet from the crossing, the locomotive was within 200 feet thereof and was in plain view of Taulbee. If he did not see it, it was because he did not look. His view of it was wholly unobstructed. If he had looked, he could have seen the locomotive and could have stopped his automobile in time to avoid the collision. Failing to do so, he was guilty of negligence." After a painstaking examination of the exhibits and a careful consideration of defendant's own evidence I am unable to reach this conclusion. The appellant's exhibit, which is the foundation for the majority opinion, shows that when the driver of the car was 20 feet from the track he could see the engine approximately at a distance of 177 feet. I am quite convinced that, at the moment he reached this place in the road, if he had looked and seen the approaching engine he could not then have avoided the collision. The testimony of the company's engineer who prepared the maps and photographs was that an automobile within 15 feet of the center

of the main line track at this crossing would then be in danger of being struck. It follows that if the driver was proceeding on this road and had seen the approaching engine at this first point of vision it would have been necessary in order to save himself from disaster that he stop within five feet. Witnesses vary as to the speed at which decedent approached the crossing—estimates are from 6 to 12 miles per hour; accepting any of these figures we find that he would be in the zone of peril in less than a second and, possibly, within a third of a second of time. From this situation it was impossible for him to extricate himself as he could not have stopped before some portion of his automobile had come within the danger line and it was inevitable that he would be struck by the oncoming train which hit him within two seconds from the time he first could see it. In my opinion he could neither stop or reverse his engine in time to avoid the onrushing engine.

In Pokora v. Wabash Ry. Co., 292 U.S. 98, 100, 101, 54 S.Ct. 580, 581, 78 L.Ed. 1149, 91 A.L.R. 1049, the court said:

"The burden of proof was on the defendant to make out the defense of contributory negligence. [Citing case.] The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop. A space of eight feet lay between the west rail of the switch and the east rail of the main track, but there was an overhang of the locomotive (perhaps two and a half or three feet), as well as an overhang of the box cars, whch brought the zone of danger even nearer. When the front of the truck had come within this zone. Pokora was on his seat, and so was farther back (perhaps five feet or even more), just how far we do not know, for the defendant has omitted to make proof of the dimensions. Nice calculations are submitted in an effort to make out that there was a glimpse of the main track before the switch was fully cleared. Two feet farther back the track was visible, it is said, for about 130 or 140 feet. But the view from that position does not tell us anything of significance unless we know also the position of the train. Pokora was not protected by his glimpse of 130 feet if the train at the same moment was 150 feet away or farther. For all that appears he had no view of the main track northward, or none for a substantial distance, till the train was so near that escape had been cut off. [Citing cases.]

"In such circumstances the question, we think, was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight. No doubt it was his duty to look along the track from his seat, if looking would avail to warn him of the danger. This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on, any more than there would have been in trusting to his ears if vision had been cut off by the darkness of the night. [Citing case.] * * *

"A jury, but not the court, might say that with faculties thus limited he should have found some other means of assuring himself of safety before venturing to cross. * * * Indeed, the statutory signals did not exhaust the defendant's duty when to its knowledge there was special danger to the traveler through obstructions on the roadbed narrowing the field of vision. [Citing cases.]"

The majority opinion seems to rely on the case of Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645. However, the case of Pokora v. Wabash Ry. Co., supra, is a later case and more directly in point and contains this significant statement (292 U.S. 98, at page 106, 54 S.Ct. 580, 583, 78 L.Ed. 1149, 91 A.L.R. 1049): "The opinion in Goodman's Case has been a source of confusion in the federal courts to the extent that it imposes a standard for application by the judge, and has had only wavering support in the courts of the states. We limit it accordingly."

Under the circumstances here established by the evidence and the conflicts so apparent in the testimony, the question was for the jury to determine, and it would have been error for the court to undertake to decide disputed questions of fact. The judgment of the District Court should be affirmed.