**WINFIELE v. TEXAS & P. RY. CO. et al.**
**No. 1159.**

Court of Appeal of Louisiana. First Circuit.
Oct. 5, 1933.

Lewis & Lewis, of Opelousas, for appellant.

Hudson, Potts & Bernstein, of Monroe, Peterman, Dear & Peterman and Hawthorn, Stafford & Pitts, all of Alexandria, and Wm. Alex Robertson, of Opelousas, for appellees.

LE BLANC, Judge.

The main line of the Texas & Pacific Railway Company runs through the hamlet of Rosa which is situated between the villages of Morrows and Palmetto in the parish of St. Landry. There is some confusion as to the exact direction in which it runs; the railroad people referring to it as east and west, and the people of the locality as north and south. As a matter of fact, it runs almost directly northwest and southeast, but for the purpose of brevity and convenience it will be herein considered as running north and south; north being in the direction of Alexandria and south toward New Orleans. The road at that point, and for a long distance on either side, perhaps for miles, runs in a straight line. Adjoining it on the west is the Jefferson highway with an 18-foot concrete pavement, and paralleling the main track on the east for a distance of nearly 2,000 feet is a siding or house track about 15 feet away.

The railroad station is situated north of the inhabited part of the hamlet, and 244.3 feet south of the station is a crossing leading from the Jefferson highway into the hamlet proper. This crossing is known as the north crossing. The road into which it leads runs northeasterly in a sort of semicircle near the eastern arc of which is the general merchandise store of Mr. E. V. Hudspeth. From this point it runs back south and west in its semicircular route to the railroad tracks which it again crosses and then leads again into Jefferson highway. This last crossing is known as the south crossing, and is situated 1,083.8 feet from the railroad station. The distance between the two crossings therefore is 839.5 feet.

On the morning of November 5, 1931, Thomas E. Winfiele, employed as a traveling salesman by Dietlein & Jacobs Wholesale Grocery Company, Limited, of Opelousas, and traveling in a Ford sedan furnished by his employer, called at Mr. Hudspeth's store, as he did every week, and sold the latter a bill of goods. As had been his custom, he had crossed the railroad tracks at the north crossing to get to the store and was driving to the south crossing to get back to the highway. While in the act of negotiating the south crossing his car was run into by a fast running east-bound train of the Missouri Pacific Railroad Company. As a result of the impact, he was thrown from the automobile and sustained injuries which rendered him unconscious and from which he died about forty minutes later.

This suit is brought by his widow for herself and in her capacity as natural tutrix of her minor child Beverly Jane Winfiele, seeking to recover judgment for damages for the death of her husband against both the Texas & Pacific Railway Company and the Missouri Pacific Railroad Company, in solido. The full amount demanded is $25,000, of which $10,000 is claimed for herself and $15,000 for her minor child.

The train which ran into Mr. Winfiele was a special Missouri Pacific train carrying a football squad from St. Louis, Mo., to New Orleans. It is alleged in plaintiff's petition that the train was being operated over the Texas & Pacific Railway Company's rails under and by virtue of a contract and agreement between the two railroad companies, and with the consent, permission, and acquiescence of the Texas & Pacific Railway Company. There is no serious dispute made on this point, and it is not made an issue by either defendant. They have filed separate answers, but make practically the same defenses.

In her petition, plaintiff specifies the following acts of negligence on the part of the defendants as contributing to and causing the death of her husband:

(1) That the Texas & Pacific Railway Company over whose rails the train was running maintained a whistling post, designed to give warning to the train engineer that he is approaching a grade crossing, north of the north crossing, but none between the north and south crossings, and the result is that the engineer is not apprised by any sign that he is approaching a second crossing.

(2) That the special train of the Missouri Pacific Railroad Company which ran into her husband's car was being operated by an engineer and fireman of that company, and that they were unfamiliar with the road over which they were running; that there was no pilot in the cab to instruct them of the dangers of the road, and as a consequence of their ignorance thereof no bell or whistle signal was given as they approached the south crossing.

(3) That the Missouri Pacific Railroad Company, being charged with the fact that the hamlet of Rosa is a populous one and

at which there are maintained two grade crossings, at one of which the view is obstructed, it was negligence on the part of those in charge of its train not to decrease its speed and not sound the bell and whistle as required under the law.

(4) That the train was being run at a terrific rate of speed alleged to have been 70 miles per hour.

(5) That the Texas & Pacific Railway Company had caused to be placed a box car and gondolas on the siding or house track and that these obscured the view of any one attempting to negotiate the south crossing, and further that this company was negligent in allowing a train to be run over its tracks by an engineer unfamiliar with its road and without the assistance of a pilot, as required by railway regulations and custom.

The defense of both railroad companies may well be said to be a denial of the specific acts of negligence charged against each and a plea of contributory negligence on the part of the decedent in failing to have taken the usual precaution of "stopping, looking and listening" before attempting to negotiate the south crossing, which contributory negligence operates as a bar to the plaintiff's recovery.

On these issues the case was tried in the lower court, and, from a judgment dismissing the plaintiff's suit, she has appealed.

In their brief before this court, counsel for plaintiff state that she "relied on the following specific acts of negligence to fix liability on the defendants:

"(1) The excessive speed of the train.

"(2) The creation of a blind crossing by the negligent placing of box cars.

"(3) The failure to maintain a proper lookout.

"(4) The failure to give warning of approach by bell or whistle."

We may assume, therefore, that the other acts of negligence charged in the petition, which consisted of the failure to maintain a whistling post between the two crossings, and failure to have a pilot in the cab to instruct the engineer with regard to the dangers of the road, are no longer to be considered as issues in the case. We think it proper that they should have been abandoned, as the record discloses that the engineer running this special train was a Texas & Pacific engineer with over 20 years' experience in operating trains between Alexandria and New Orleans, thoroughly familiar with the road, and therefore there was no necessity for a pilot; and as for the absence of the whistling post complained of, there is no law, ordinance, rule, or regulation referred to which requires their installation. As far as the testimony in this case reveals, the custom seems to be rather that they are never placed within switch limits, and the place where plaintiff would have required the alleged missing one would have been within such limits.

It is not disputed that as this special train passed Rosa, it was going at a fast rate of speed, the trainmen themselves estimating the speed at from 50 to 55 miles per hour. One of them, assigned to the special duty of acting as train master and seeing that the train was properly operated and that the train rules were complied with, had purposely checked the speed about two miles north of Rosa station and found that they were running around 55 miles an hour. Other defendant witnesses, not trainmen, give different estimates of speed ranging from 60 to 70 miles per hour. Plaintiff's witnesses, for the greater part, agree in saying that the train was going faster than the regular trains go through Rosa, and one, particularly, thinks that it was running between 65 and 70 miles an hour.

■ The rate of speed of a railroad train, where not regulated by statute or municipal ordinance, depends on the varying conditions which present themselves along the route over which it travels. A speed of 55 or 60 miles per hour which might very well be considered grossly negligent when going through populous centers, may be perfectly proper in the wide open spaces of the country. This, in effect, is what was held years ago by the Supreme Court in the case of Houston v. V., S. & P. R. Co., 39 La. Ann. 796, 2 So. 562, has been affirmed in numerous cases since, and reaffirmed only a few weeks ago by the Court of Appeal for the Second circuit, in the case of Jeter v. Texas & Pacific Ry. Co., 149 So. 144, 145, wherein the court said:

"In the open country outside city limits, any speed is legitimate for a railroad train which is consistent with its safety. Davis et al. v. Alexandria & W. Ry. Co., 152 La. 898, 94 So. 436."

With this principle established, we have now to consider the nature of the route over which this special train of the Missouri Pacific Railroad was traveling at the time of this unfortunate accident.

■ Plaintiff's counsel would try to impress upon the court that the settlement of Rosa and the surrounding country is a populous community with heavy traffic going over the two railroad crossings herein described, therefore entailing a rather strict regulation in the matter of speed by railroad trains passing through there. But such is not our reaction to the testimony on this point. In the first place, whilst the Texas & Pacific Railway Company maintains a station agent at that point, the evidence is to the effect that it is not a reg-

ular stopping place for the trains and is actually listed in the Texas & Pacific time-table as a flag station. The hamlet of Rosa proper, situated about 245 feet from the station, according to Mr. E. V. Hudspeth, plaintiff's witness, consisted at the time of the accident, of three stores, a cotton gin, a potato house, cane derrick or rack, three residences, and five tenant houses. Neither the cotton gin nor the cane derrick were being operated at the time, and the potato or seed house, as we understand it, is a small enterprise employing from five to eight people. The photographs offered in evidence by plaintiff and defendants substantially bear out this description of the settlement and with it convey the impression that this is no more than a sparsely settled community with very little, if anything, to differentiate it from the ordinary open country route through which trains travel without any particular regulation as to speed. True, Mr. Hudspeth speaks of the number of families that are served by the local post office, but these live within a radius of nearly two miles in each direction. He frankly admits, in answer to the direct question as to whether this is a thickly populated village or not, that it is not.

In view of the character and nature of the country therefore, and of the law as stated in the decisions cited regarding the speed of railroad trains, and assuming, as we believe the testimony shows, that the speed of this special train was approximately 56 or 57 miles per hour, we hold that there was no negligence on the part of the defendants on this point on which they, or either of them, can be held responsible in damages for this accident.

The plaintiff's next charge of negligence, as enumerated in brief of her counsel, is the creation of a blind crossing by the placing of box cars on the siding or house track, too near the south crossing, where Mr. Winfiele's automobile was struck.

From the plats or sketches produced by both sides, which may be said to be substantially the same, it appears that the potato house is situated 47 feet from the main track, and that there were located on the side track at the time, opposite the potato house, two gondolas or cane cars which were to be used to load cane during the harvesting season that was to open shortly. These gondolas are said to be 8½ feet wide and 47 feet long. The south end of the one nearest the south crossing was 97 feet distant therefrom. Taking into consideration the distance between the potato house and the main track, which is 47 feet, and reducing that space by about 20 feet, which we assume to be the distance from the main track to the east edge of the gondola, it would seem that there was an open space between the potato house and the gondola 97 feet

away, of some 27 feet. The other box car is shown to have been spotted directly in front of the loading platform of the cotton gin. This platform is at a distance of about 300 feet from the south crossing, as measured according to the scale of the plat offered in evidence by plaintiff. Situated between the cotton gin platform and the potato house at about the same distance east of the tracks as the potato house was the cane derrick.

The situation as thus described from the plats of survey is reflected in the photographs found in the record, some of which were taken under the direction of the plaintiff and others under that of the defendants. As shown from the photographs offered by plaintiff, the view of the track from the south crossing appears obstructed, and from the photographs of the defendants it looks unobstructed. Counsel for plaintiff contend that in taking the pictures offered by the defendants, the cameras were placed in positions that would bring about results the most favorable to their cause. In other words, they urged that the views as shown by these photographs are deceptive. But, it may be asked, could not the same contention be made with regard to the photographs taken at the instance of the plaintiff to sustain her cause as well? We do not think it necessary to have to reply on any of these photographs to decide this point, however, as from our own appreciation of the testimony revealing the physical facts and the testimony of plaintiff's own witness, Mr. R. M. Hollier, civil engineer, which will be referred to later in this opinion, it seems clear that the driver of an automobile approaching the tracks at this crossing had all the view that was necessary to keep him in perfect safety of an on-coming train if he chose to exercise the required precaution.

On this charge of negligence also, we find that the plaintiff has failed to carry the burden of proof which the law placed on her.

The third specification of negligence as outlined in brief of counsel for plaintiff is the failure of those in charge of the train to have maintained a proper lookout. Among trainmen, the duty of keeping a lookout is one which devolves peculiarly on the engineer and the fireman because of their positions in the cab. In this case, the testimony of the engineer, W. N. Bond, is to the effect that he was looking ahead just before and at the time he struck Mr. Winfiele's car. He says however, that as his position in the cab was to the right and the car was approaching from the left side of the train, and also because of the height of his place from the ground and the bulk of the engine before him, although he saw him coming

toward the track when the train was 75 or 100 feet away, he lost sight of him as the train got closer to the crossing. Plaintiff's principal complaint on this score, however, is directed at the failure of the fireman to have kept a lookout, claiming that as he occupied the favorable position on the left-hand side of the cab, he should have seen Mr. Winfiele in time so as to warn the engineer of his presence near the tracks, contending that the engineer could then have slowed the train down, and thus Mr. Winfiele would have had the benefit of a "split second" of time which would have enabled him to safely negotiate the crossing. Counsel urge that a "split second" is very little to ask for to save the life of a human being, and so it is. Yet, on the other hand it is a very small margin on which to hold another responsible for the death of that human being. Unfortunately for the plaintiff in this case, however, the fireman, on this train, who, it is claimed, might have afforded this almost incalculable space of time to the decedent, did not testify, and what the purport of his testimony would have been has to be gathered from a stipulation regarding the same which is found in the record. That stipulation is to the effect that A. G. Ruiz, the fireman, would, if sworn, testify substantially to the same facts, as did Mr. Bond the engineer, and in addition it is further stipulated that he had been in the railroad service for 26 years, and that on the day of this accident he was at his seat on the left-hand side of the cab, but did not see the automobile of Mr. Winfiele before it was struck. The evident reason for his not seeing it appears in the statement immediately following in the stipulation, which we quote: "That before reaching the south crossing he was manipulating the fuel oil valve which controls the supply of fuel to the burners in the fire box, and had glanced at the oil gauge in connection therewith." On this point, the engineer's testimony, which under the stipulation has to be considered substantially what Ruiz's would have been, is to the effect that this engine was fired by an oil burner which the fireman has to continually be looking after, and that as they passed the crossing Ruiz was engaged in his duties in that respect.

Now our conception of the law is that whilst the engineer and fireman are charged with the duty of keeping a proper lookout they are not required to both be on a constant watch at the same time. It must be recognized, as indeed the testimony in this case shows, that they both have other important duties in the cab which require their attention. It is physically impossible for them to attend to these duties and at the same time have their vision focused on the track ahead of them. We believe that when, as in this case, it is shown that the engineer was keeping the proper lookout while the fireman was attending to other duties which required his vision elsewhere, the purpose of the law in this respect has been complied with, and there is no negligence on their part. The Court of Appeal for the Northern circuit, in the case of Sorey v. Yazoo & Mississippi Valley R. R. Co., 17 La. App. 538, 136 So. 155, held that on a train running on a straight stretch of track, in the open country, it is not negligence for the engineer to take his eyes off the track ahead for a short time. The same rule, it would seem, would apply with greater force in the case of a fireman whose duties, as shown in this case, require that he almost continually manipulate the valves which control the fuel that has to be fed to the oil burners on the engine. This is in conformity with the general rule as thus stated in 52 C. J. 226:

"If the proper operation of a train makes it necessary that the trainman perform other duties which prevent his keeping a lookout, his failure to maintain a lookout cannot be regarded as negligence."

We pass now to the further and last alleged act of negligence discussed in brief of counsel for plaintiff. That is the failure to have given proper warning of the train's approach by blowing of the whistle or ringing of the bell. Because of the mandatory provisions of Act No. 12 of 1924, which require that the locomotive bell be rung or the whistle blown at a distance of at least 300 yards from a railroad crossing, and because of the conflict in the testimony on the question as to whether both or either of these warnings were given at all at that distance from the south crossing, this becomes plaintiff's strongest point in the case.

It is positive that the whistle blew for the station, but as the station itself is more than the 900 feet, required for a crossing signal under the statute, from the south crossing, that was not a compliance with its provision. Some of the witnesses for plaintiff say that they heard it blow when it was passing by Firman's Store. This store is situated between the station and the north crossing, and, as the distance between the two crossings is 839.5 feet, it may be that Firman's Store is more than 300 yards from the south crossing. Others of plaintiff's witnesses state that they paid no attention to the matter and would not say whether the whistle blew at all or not. This is so as to Mr. E. V. Hudspeth, Sr., and also as to Mr. Hudspeth, Jr., who was sworn as a witness for the defendants. Lawrence Lewis, a colored boy, 18 years old, witness for the defendants, testifies that he heard only one whistle blow and that was when the train was approaching the station. The other

witnesses for the defendants, consisting of the train crew, all testify that they heard the whistle blow for both crossings, except the conductor, J. C. Webb, who says that there was no crossing warning blown for the second crossing. The engineer whose duty it was to blow the whistle is positive that he gave all the warning required, and described in detail the manner in which the blasts were given, all of which he contends complied with the statute and the usual railroad regulations.

True it is that in considering the evidence on this point we are asked to weigh positive testimony against negative proof, and true also that in giving it effect we have to take into consideration a well-recognized rule of evidence to the effect that the testimony of those who swear to the performance of certain acts which they are charged with the duty of doing themselves should be given more weight than that of others who merely happen to be present and are more or less unconcerned with what is actually taking place, nevertheless, because of the considerable negative proof here on the question of the blowing of the whistle, the testimony as a whole might properly be resolved in favor of the plaintiff and against the defendants. And the same might be said, with perhaps greater force, on the question of the ringing of the bell, as what proof there is in the record is stronger as regards the blowing of the whistle than it is of the ringing of the bell. In this connection, it may be pertinent to remark that the engineer himself, in giving his statement at the coroner's inquest following the death of Mr. Winfiele, did not mention anything about ringing the bell, although he stated that he blew all the whistle signals, the same as he testified on the witness stand.

 If there has been any negligence shown whatever against any of these defendants therefore, it rests on this last point; but unfortunately for the plaintiff, it can avail her nothing as we are convinced that her husband, by his own negligence, contributed to his untimely death, which of course bars her recovery.

It is in evidence in the record, and not disputed, that the grade crossing is properly constructed, and was in first-class condition on the morning of this accident. According to the testimony of Mr. Hollier, the civil engineer who was plaintiff's witness, the gondolas or cane cars, which plaintiff's counsel contend obstructed a view of the track toward the north, were located, as already shown, 97 feet from the center of the crossing. He says that with the gondolas at that location, from a point 6 feet east of the east rail of the siding or house track, in other words some 23 or 24 feet from the main track, a person could see 180 feet up the track (meaning north of course). When he reached the center of the side track, his view extended 370 feet, and from a point .6 feet east of the main track, he could see "all the way down." This, it must be remembered, is the testimony of the plaintiff's own witness. With what other testimony there is on this point, there can be but little doubt that any one observing in the least bit, the ordinary, not to say the now statutory rules and regulations of care and precaution prescribed, would have been in no danger of being run over by a train at this grade crossing.

One of the last persons to see Mr. Winfiele as he drove toward the tracks was Mr. J. E. McGuire, one of plaintiff's witnesses. He was engaged that morning in hauling sweet potatoes for Mr. Hudspeth. In order to reach the potato house from Mr. Hudspeth's gin yard, he had to pass through a gate in the fence surrounding the yard and along the road leading from the Hudspeth store to the crossing. As he stopped at the gate, he heard the train whistle blow just above the depot, and also heard the rumbling noise of the train as it came on. While he was there he also saw Mr. Winfiele pass. From that time on, we shall let his testimony speak for itself:

"Q. Where was this man in the car (referring to Mr. Winfiele) at the time you heard it (referring to the train)? A. I don't know, he had passed me.

"Q. How long had he been past? A. It was a mighty short time.

"Q. He had passed there and struck a match to light his pipe before you heard the whistle? A. Yes sir.

"Q. How long after you saw him light his pipe before you did hear the whistle? A. A very short time.

"Q. How far was he from the crossing at the time he lit his pipe? A. I couldn't say. I never paid that much attention.

"Q. Would you say he was going ten miles an hour? A. Yes sir.

"Q. Did he increase his speed after that? A. I don't know.

"Q. As a matter of fact, he might have struck a match and it went out and he might have struck another? A. Maybe so.

"Q. He had both hands off the steering wheel? A. Yes sir.

"Q. Did he seem to be looking out for the train? A. It didn't look like it.

"Q. He was absorbed in trying to light his pipe? A. Yes sir."

The other person who saw Mr. Winfiele as he drove toward the crossing was Mr. E. V. Hudspeth, Jr. In a statement given at the time of the accident, this witness said that when he waived at Mr. Winfiele, he paid no

attention, and continued to drive ahead and "seemed to be in very deep thought." On the witness stand he is a bit evasive when questioned regarding the statement, but we are of the opinion that what he said on that occasion correctly conveyed his impression of Mr. Winfiele's attitude as he passed him. It is significant also that he observed Mr. Winfiele lighting his pipe as had Mr. McGuire. We think that both of these witnesses were struck on that morning, with the apparent listlessness with which Mr. Winfiele was driving toward that railroad crossing. Oblivious as to where he was and to what he was doing; it is reasonable to assume that he entered upon that crossing without having taken into account the danger that he was apt to meet.

It must be recognized, as has been done time and time again by the courts, that a railroad company is entitled to the exclusive use of its track or roadbed, and that it enjoys a right of way over its rails for the purpose of operating its trains. This right of way prevails at grade crossings the same as at any other point on its tracks, and any one venturing over such crossing must yield that right of way. In Louisiana that duty, especially as regards an automobile driver, is prescribed by statute which makes it unlawful for him to drive or propel his automobile upon a railroad track at a grade crossing over which trains are operated at high speed, without first stopping at a distance of not less than 10 feet nor more than 50 feet from the nearest track and looking for a train. Act No. 12 of 1924. The duty of a driver to stop, look, and listen at a grade crossing is characterized as a "standard of conduct" in the case of Baltimore & Ohio Railway Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 25, 72 L. Ed. 167, 56 A. L. R. 645, and as stated by the Supreme Court of the United States, "When the standard is clear it should be laid down once for all by the Courts."

The only witness who claims to have seen Mr. Winfiele's car as it entered the crossing, is the negro boy Lawrence Lewis, whose testimony is bitterly assailed by counsel for plaintiff. It is noted, however, that this boy had been interviewed by counsel at the time of the accident, and they had obtained a signed statement from him. Moreover, they had summoned him as a witness, as had also the defendants, but they did not place him on the stand. Defendants therefore made him their witness. This boy was walking north along the paved highway. When he was about 300 feet south of the south crossing he saw Mr. Winfiele's car coming toward the tracks. He testifies that the car was traveling about 10 or 15 miles an hour as it approached the crossing, continued over the tracks, and was struck on the rear right end by the train. He could not say at what distance the car was from the crossing when he first saw it, but refers to it as being above the curve in the road. He saw it from that time until it was struck, and says that he did not see it stop. He was too far away, however, to see if Mr. Winfiele looked up or down the track. This witness was subjected to a most rigid cross-examination by counsel for plaintiff, but maintained throughout it all that he did not see the car stop. He would not swear that it did not stop, but he insists that he was looking at it and the train all the time and that he did not see it stop. Counsel's attack on this boy's testimony is based on what they contend is the conflict between what he said on the witness stand and the statement he gave them at the time of the accident. But we are unable to find the great conflict which counsel claim exists. Naturally the statement does not contain near all that he told on the witness stand in answer to the long examination he was put through, but what is missing in the statement is not there for the obvious reason, as we presume, that he was not interrogated as to those particular facts. His testimony impresses us as having been given in an honest effort to tell all that he knew about the accident, as he saw it, and there is nothing in it that indicates any unworthy motive on his part. To some extent at least he is corroborated by the testimony of W. N. Bond, the engineer, who swears that when he saw Mr. Winfiele's car, at the moment when the train was 75 to 100 feet from the crossing, it was in motion.

Considering this testimony and all the circumstances attending this terrible accident, it is impossible to believe that Mr. Winfiele stopped his car before going on the main track of this railroad company or even at the time when he was between the main track and the siding. Had he stopped at either place, and merely glanced northward along the main line, he could not possibly have failed to see the advancing train and take the necessary precaution of avoiding an accident. When he was between the tracks, according to plaintiff's own witness, Hollier, he could see 370 feet north, and when he was 6 feet from the main track he could see "all the way" up the main line on which the train was coming toward him. To us, the conclusion seems irresistible that he did not stop and he did not look. If he looked, he was bound to have seen the train, and, if seeing it, he nevertheless heedlessly continued on across the track, he failed in that "standard of conduct," which courts are asked "to lay down for once and for all" by the Supreme Court of the United States in the Goodman Case, and his failure constituted negligence on his part which denies his widow and child the right to recover in this action against these defendants.

In a supplemental brief filed by counsel for plaintiff after the case had been submitted to this court, we are asked to apply the doctrine of the last clear chance and to hold, in the event we find that there was no contributory negligence on the part of the deceased, defendants had the last clear chance of avoiding the accident. A discussion of this doctrine under the facts in this case would, in our opinion, merely lead to repetition and further discussion of some of the evidence and the law under the various charges of negligence against the defendants, especially that in connection with the alleged failure to have maintained a proper lookout.

█ It is unnecessary for us to have to repeat that it is our conclusion, from the evidence, that the deceased did see or should have seen the danger in time to have averted it. All opportunity of seeing it and of avoiding it at the last moment was with him. Moreover, the testimony, in our opinion, shows that his negligence continued up to the very moment of the accident, and under recent decisions of this court, where such fact appears, the doctrine of last clear chance cannot be invoked on his behalf. Pigott v. Bates (La. App.) 143 So. 535.

The very length of this opinion, we believe, serves as proof that we have given consideration to every material point and issue presented in this case. It was a most deplorable accident, in that it took away the life of a young husband and father and left his widow and child bereft of his companionship, love, and support. There is no one, we are sure, who does not commiserate them for their misfortune. In passing on their claim for damages, however, we have to look upon the accident as revealed through the pages of the record that is before us, and on that record, and under the law, we find ourselves unable to fix liability on either of the defendants herein.

The judgment appealed from is affirmed.