**LOUISIANA & ARKANSAS RY. CO. v. JACKSON et al.**

No. 8626.

Circuit Court of Appeals, Fifth Circuit.

March 23, 1938.

Rehearing Denied April 14, 1938.

Lawrence K. Benson, of New Orleans, La., and A. L. Burford, of Texarkana, Tex., for appellant.

H. W. Robinson, of New Orleans, La., for appellees.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

Injured in a highway crossing collision between Giles' automobile and appellant's switch engine, occurring at about 5:55 on a dark, foggy, rainy morning, in February, appellees sued for the damages resulting. Their claim was that while they were proceeding at moderate speed along a much traveled public highway, defendant's switch engine, without any warning being given of its approach, by bell, whistle, or other signal, was backed at an excessive speed on to the highway and into collision with their automobile. There was a general denial, a plea that plaintiffs' negligence

in driving onto the crossing recklessly and in total disregard of the Louisiana law stop sign, of the warning of the flagman, and of the brightly lighted tender, the whistle, bell, and other signals from the engine, was the sole proximate cause of the collision, and a plea that plaintiffs were contributorily negligent. The evidence concluded, defendant insisting both that there was no proof of defendant's negligence, and that plaintiffs were contributorily negligent, moved for a verdict. The motion was denied, and there was a verdict and judgment for plaintiffs. This appeal tests whether there was error in refusing to instruct.

Appellant recognizes and accepts its burden to show that plaintiffs' case failed, as matter of law, either for want of proof that defendant was negligent, or because the evidence conclusively established plaintiffs' contributory negligence. It insists that plaintiffs' evidence, except as to the presence of a flagman at the crossing, was negative, and that their denial of the flagman's presence was conclusively contradicted by the physical facts.

In support of its claim that evidence of negligence on its part is wholly wanting, it points out that plaintiffs did not testify that no signals were given. They testified merely that they did not see or hear any warning signs and signals, while its own evidence is direct, positive, and uncontradicted that the crossing was protected by a Louisiana law stop sign, and by a flagman at the crossing giving warning signals; that the engine's tender was brightly lighted, that the whistle was blown before and the bell was rung continuously after the engine started over the crossing, and that the sole proximate cause of the collision was plaintiffs' negligence in failing to stop at the sign and in coming on over the crossing in the dark, with all windows shut and obscured by fog and rain. Pollard v. Davis, Receiver, 5 Cir., 93 F.2d 193.

In support of its claim that plaintiffs were contributorily negligent, it points to plaintiffs' admissions that because it was raining and cold, all the windows in the car were up, that it was dark and foggy, and the windshield wiper was running to keep the mist and rain off the front window so that plaintiff driver could see in front, that he did not see and did not stop at defendant's Louisiana law stop sign, nor did he look to the side of the car until at the moment of the collision, but he looked and drove straight ahead, and did not see the engine until he was practically in collision with it.

Plaintiff Giles testified on direct:

"I didn't see any sign of a railroad train before I got to this crossing where the accident happened. I did not hear any whistle, I did not hear any bell, I did not see any headlights or lights on the train. The first time I saw this train was when it was fixing to hit us when we was in the center of the track, and Lonnie hollered 'Look out, Willie.' I looked out of the window and the train slapped us over. We were then about twelve feet from the engine. I did not see any lights on the train when I looked out the side and saw it. I am positive there was no flagman there at that intersection; there was nobody there with a red lantern."

And on cross-examination:

"The first time I saw this train I was right on it. I was too close to do anything about it. All of the glasses in the car were up because it was raining and dark and foggy. I was using the windshield wiper to keep the mist and rain off the front window; the side windows were clean. If they were not I would have kept them down. My headlights were burning and I could see about 50 feet ahead. When I first saw the engine we were in the center of the track. Lonnie, [the other plaintiff] said 'Look out, Willie' and I looked out. I do not know how fast I was going. I told you in the beginning I did not know how fast, but I was going along at a common, ordinary speed. I was not running real fast. At the first crossing, [that of the Illinois Central] I stopped at that first red light. We stopped at the first track, and the car was in second when the train hit me. I stopped at the first track because I saw caution. I had my car in second when the engine hit us; I ran it 200 feet from the first track where I stopped to when it hit me, in second.

"I was looking straight ahead up the road and traveling about 10 or 15 miles an hour. I was looking straight ahead. When I saw the train we were in the center of the track with the car."

Lonnie Jackson, the other plaintiff, testified:

"I cannot tell how fast Giles was driving his car on the morning of the accident,

but it was running about moderately. I do not think it was over 15 miles an hour, something like that. I know where that railroad track is. I saw no lights, no signs at the crossing, and I did not hear anything from the train. I did not hear any bell from the train. I did not hear anything like that. I did not see the engine that hit the automobile. I just seen the light under the train and hollered to the man, but the thing was right on us when I seen that light. There was a little rain falling and I could not see the train. I was very familiar with that little crossing there; he was not, but I was. I worked there a long time. I did not see any other lights, just the light in the oil pan under the engine. The automobile was not on the track when I saw the light. It was right at it. I figured it was a train and I seen the light flash from the oil pan and I hollered. We must have been up on the train then. I knew where that Louisiana stop sign out there by the railroad was, but I did not see it there. It was a pretty cool morning when this accident happened, it was dark, and I could not see. I was in the car but I was not asleep; you could see in front of you on account of the windshield wiper but you could not see so good on the sides, because it was raining on the glass and you could not see so good, it was so much fog. I was sitting on the side with the wiper. I could see in front very good. I was right behind Willie, he was driving, and I could see that the windshield wiper was going, but I could not see so good out of the other windows. I saw that flare from the oil pan on the side after we got right up onto the train, and I hollered."

Hillary Tobias, another occupant of the car, testified:

"The morning of the accident was a cloudy, hazy, rainy day and cold. I guess Giles was driving about 25 or 30 miles an hour. It wasn't over that, not very fast. I saw the train, but when I saw it it had just about done hit. I saw it just a little before it struck, but I don't know which way the locomotive was going because I couldn't see but one light, and that was the light from the ash pan. We was right on it when I saw it; the automobile must have been around the pavement near the railroad. I saw a flare in the pan, but I did not see any headlight because it was backing up. I did not see but one light, that was the light from the ash pan. I heard no whistle and no bells. There was no flagman in the middle of the road with a lantern. I did not see the flagman until after the wreck was over. He came from the back of the train. I do not know whether the engineer or the fireman, but one of them told him, 'if you had been where you should have been this would not have happened.' I know about that crossing. I have passed it a number of times, and have seen the stop sign there, and I do not believe there is anything to obstruct it. The weather was cold and misty, and we had all the windows up all the way around. There was a little moisture on the windows, but you could see. I could see out of the side and also the windshield wiper was working, and we wasn't driving fast, not over 25 or 35 miles an hour. Anybody looking at the place where the windshield operated should have seen that same flare. It was down underneath the engine, but a person looking straight ahead could hardly see it. I suppose if Willie had looked to the right or left he would have seen it in time to stop. If I had been seated at the place where the driver was seated, I could not have seen it and watched the cars in front of me. If I had looked to the left I would have seen it. This was Willie's second trip to pick us up and take us to work. We had the windows of the car up and I did not hear the bell ring. I suppose that what would keep me from hearing the whistle would also keep me from hearing the bell."

Defendant's witnesses, the watchman, the engineer, the fireman, and the switchman, all testified that the train blew its whistle before it started up, about 16 feet away, to go over the crossing. That, as required by the regulations of the Interstate Commerce Commission, there was a bright light burning on the back of the tender, that the bell was being rung constantly from the time the movement started, until the collision, and that the engine was moving very slowly. They all testified too, that the flagman was on the crossing flagging it with a lantern, until the train moved onto it, and until he jumped behind the engine to avoid the impending crash. The night manager of an oil station near the crossing corroborated their testimony that the flagman

was on the crossing flagging it, and that while he was still there, the engineer blew the crossing signal.

Both the engineer and the flagman denied Tobias' testimony that the engineer complained of the flagman not being on the crossing; both testified positively that he was there until he saw that plaintiffs were not going to stop for the sign, and that the collision was imminent.

■ The evidence standing thus, with positive testimony on plaintiff's side that there was no flagman at the crossing, it must, in view of the jury's verdict for plaintiffs, be assumed that none was there.

■ As to the other grounds of negligence, that the tender was unlighted, and that no warning signals by bell or whistle were given, defendant's evidence being positive and uncontradicted that they were, and plaintiffs' evidence being merely that with shut windows, obscured by mist and fog, they neither heard nor saw the signals, it must be taken that these were not proven. Pollard v. Davis, supra; Fayet v. St. Louis & S. F. Ry. Co., 203 Ala. 3, 81 So. 671.

It remains only to determine whether the absence of the flagman was negligence, which, under the circumstances, could have proximately contributed to the injury, and whether plaintiffs were themselves guilty of contributory negligence.

■■ As to the first point, the negligence of defendant in not having a flagman, we think that the nature of the crossing and of the backing movement over it in the dark, was such as that a jury might find that ordinary care required the crossing to be flagged before the engine was backed over it.

We think, too, that though the evidence that the crossing was being flagged greatly preponderated, there was evidence to support a jury finding that it was not, and that the judgment must be affirmed because of that negligence, unless it appears that plaintiffs' contributory negligence has barred them. When we come to that, we think it perfectly plain that as to the driver of the car, defendant should have had an instructed verdict; for, on a dark and foggy morning, with the windows of his car all tightly closed, he drove recklessly onto defendant's tracks, without stopping as he was by law required and warned by the stop sign to do, while because of the shut windows of the car, and the fog and rain and dark, he could neither hear nor see the signals evidencing the approach of the train. Baltimore & O. R. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645; as interpreted and approved in Pokora v. Wabash R. R. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049; Northern Pacific Co. v. Bacon, 9 Cir., 91 F.2d 173; Great Northern R. Co. v. Taulbee, 9 Cir., 92 F.2d 20; Brown v. Southern Ry. Co., 5 Cir., 61 F.2d 399.

■■ The other plaintiff, Jackson, though, of course, not chargeable with the negligence of the driver, was in law required to exercise care for his own safety. Bradley v. Missouri Pac. Ry. Co., 8 Cir., 288 F. 484; Garrett v. Pennsylvania R. Co., 7 Cir., 47 F.2d 10; Brown v. Southern Ry. Co., supra. When his familiarity with and knowledge of the surrounding conditions of which the driver was not as well informed as he are taken into account, we think it plain that he was guilty of contributory negligence as matter of law, in failing to advise and warn the driver of the presence of the defendant's stop sign, of which he knew, and that he should not cross the tracks without stopping, or at least putting down his windows so that he could see and hear the signals of an approaching train. It was Jackson, and not Giles, who first discovered and gave warning of the train. Had he insisted on the driver taking the proper precautions by stopping, or at least letting down the windows so that the approaching train could be seen or heard, the injury would not have occurred. It was Giles' contributory negligence, in running past the stop sign and on to the tracks, in a closed and befogged car, and Jackson's in permitting him to do so without protest or warning, which was in law the proximate cause of the accident, and because it was, neither were entitled to recover.

We think the requested instruction should have been given. For the error in not giving it, the judgment is reversed and the cause remanded for further and not inconsistent proceedings.

Reversed and remanded.