**LEWIS et al. v. THOMPSON.**

No. 447.

District Court, W. D. Louisiana,
Alexandria Division.

Nov. 3, 1942.

436

Coco & Coco, of Marksville, La., for plaintiffs.

Hudson, Potts, Bernstein & Snellings, of Monroe, La., for defendant.

PORTERIE, District Judge.

This suit is brought by Lavie Lewis and his wife, Elnora, to recover from defendant, Missouri Pacific Railroad Company, $20,000 damages for the death of their two minor sons, namely, Cephus Lewis, aged 20, and Jessie Lewis, aged 16, occasioned by the collision of defendant's freight train with an automobile driven by Sam Wickliffe on January 13, 1941, at a public crossing in Forest Hill, Louisiana.

We have found the following facts, given in narrative form, to have been established by the preponderance of the evidence.

The accident occurred during the night, sometime between the hours of 10 and 10:15 p. m. Plaintiffs' two sons were employed in the construction of an Army camp at Camp Claiborne, about two miles north of Forest Hill, and at the time of the collision were traveling in Sam Wickliffe's automobile as paid passengers, en route to work on a night shift which started at 12 midnight. The older of the two deceased, namely, Cephus Lewis, was seated on the front seat with the driver and Jessie was seated on the rear seat with Guy Wickliffe, another passenger. All four worked at the Camp and came from the same neighborhood in the adjoining parish of Avoyelles; hence their travel arrangements.

The freight train was traveling south from Alexandria at a speed of 40 to 45 miles an hour, with eighty-one cars, and was a regular through train. At Forest Hill the railroad is paralleled at a distance of 200 feet by the Alexandria-Lake Charles state paved highway. The little town is incorporated but has a population of only about 500 people and is situated to the south side of the railroad track; and this explains that people desiring to reach the state highway from the south at this point must go through Forest Hill and cross the railroad right-of-way, facilitated at two places within the little town, one being the crossing at which this accident occurred, and another being about

a half mile to the south. Camp Claiborne is located just about two miles north of the paved highway from Forest Hill. Hundreds of workers made the crossing where this accident occurred within about an hour before and after the three laborers' shifts at Camp Claiborne, to-wit, 8 a.m., 4 p.m. and 12 midnight. There was not much traffic at the time of the accident; only three or four cars accumulated that night at the time.

No municipal ordinance exists at Forest Hill regulating the speed of trains.

There was a street carnival showing in Forest Hill at the time, with its tents and amusement equipment located on a site, one side parallel to (but 17 feet on) the railroad right-of-way of seventy feet on each side of track, and the other side parallel to and fifty feet from the gravel road. The carnival site paralleled the railroad for a distance of 130 feet and the gravel road for a distance of 75 feet.

Actual measurements showed there was a view north for the driver of the car up the track, as follows: From 40 feet from the east rail, and nearer, unlimited; from 50 feet from east rail, view of 900 feet up track; from 60 feet from east rail, view of 340 feet up track; from 70 feet from east rail, view of 110 feet up track; from 100 feet from east rail, view of 70 feet up track; from 150 feet from east rail, view of 50 feet up track.

Other actual measurements are: From stop sign to east rail of main track, 44 feet; from highway sign (R.R.) to east rail of main track, 127 feet; right of way, 70 feet on each side of track; road or street, 19 feet wide; tracks, fourteen foot centers; rails, 4 feet 8½ inches apart; south corner of tent, 53 feet from track, 50 feet from road or street.

The railroad authorities had on two occasions ordered the owner of this carnival to remove its tents from the right-of-way.

The train had been recently inspected as to equipment and found to be in good order. The engineer and fireman were in their proper places and were maintaining a proper lookout—the engineer seeing nothing on his side, and the fireman seeing the approaching car, coming at a reasonably slow speed, amply slow to stop within three or four feet at any time. The fireman expected the car to stop, as thousands had stopped before in time, when a freight is approaching at night with full light on. The whistle and bell were being continuously sounded for the crossing from a distance of over 300 yards from the crossing to the time of impact.

The weather was clear and the country at the situs of accident is particularly flat and level in all directions. The train passed Forest Hill on time, as regularly due, at its usual speed, with the regular whistle and bell warnings, and making the very loud noise that it always made going along through the settlement.

The street fair was almost closed, and the people who had been there had left. The town light for the crossing was on, and the lighting from the street fair itself gave no sight obstruction to drivers of vehicles coming through at the crossing. The car was being driven at about eight or ten miles an hour and decelerated to about six miles per hour within forty or fifty feet of the main track, without stop, however, and then went right on over, and, if anything, at an increased speed. The driver of the car saw the train, but believed he could make it over safely and attempted to cross; the other occupants of the car, including the two who died as a result of the collision, saw the situation, or should have seen it, but made no objection and did nothing to prevent the driver from going on over the track.

The railroad Louisiana stop-law signs, forty-four feet from the main track, were in good condition at the time of the accident, were upright and legible, had been there continuously before, and remained there continuously after, the accident, though it is true that they were repainted within a week or so after the accident—but this was in the regular run and routine of a repainting squad that happened to reach Forest Hill at that time in its regular run along the railroad line. The highway railroad sign, 127 feet from the main track, was upright and legible, too. Thus ends the narrative of facts, found by the court to have been proved by the preponderance of the evidence.

The plaintiff contends in its charges of negligence, both in petition and brief, that (1) the train was being run at an excessive and careless rate of speed; that (2) there was no sounding of the engine's whistle and there was no ringing of the bell, as required by statute; that (3) there was no mechanical protection at this crossing in the way of automatic signals or spotted

watchmen; that the circumstances and the general situation at this crossing impose such mechanical protection as a legal duty on the railroad; that (4) a street carnival was permitted to erect its tents protruding 17 feet upon the right-of-way of the railroad, thereby partially obstructing the view of drivers of oncoming vehicles; that (5) there was no proper lookout; that (6) the driver of the car "complied with the statutory law by stopping his automobile at the 'stop-law' sign and looked and listened for approaching trains" (from paragraph 3 of petition); that (7) "said crossing was the only one connecting one main graveled State Highway through the town of Forest Hill with a paved State Highway and bore extremely heavy and constant vehicular traffic in a populous area in the center of said town" (from paragraph 4 of petition); that (8) "said collision occurred shortly before change in a relay of thousands of workmen who used said railway crossing going to and from their work, causing a constant stream of vehicles to pass over said railway crossing and creating an extraordinary hazardous crossing, as well as a dangerous situation, well known to defendant who maintained no mechanical safeguards, signals or watchmen to warn or inform persons using said crossing of any oncoming or approaching trains" (from paragraph 5 of petition).

The defendant, in its answer, denies (1) that the automobile stopped when approaching the crossing; (2) that there was any material obstruction to a view of the approaching train; (3) that the train speed was excessive; (4) that there was any failure to maintain a proper lookout; (5) that there any failure to sound proper warnings; (6) that there was any fault, blame, consent or obstruction consequent upon location of the street carnival, which is best generally expressed by a quotation taken from its answer (paragraph XV): " * * * that he is without any negligence, fault or blame as to any action, condition, matter or thing, in any way bearing any proximately causal connection with the collision, * * * that his train was properly operated; was maintaining a proper and lawful speed; adequate warning by whistle and bell sounded * * * employees were in their proper places, maintaining a strict lookout ahead; * * * no abnormal weather or other conditions, obstructions to view or other unusual or extraordinary conditions or circumstances so as to charge this Defendant with any duty or obligation to take unusual or extraordinary precautions, or to have known or anticipated that an automobile would be driven upon said crossing immediately in front of said approaching train and under circumstances which rendered it impossbile to avoid the collision complained of, but that on the contrary the sole and only proximate cause of said accident was the reckless, wanton, careless, negligent and imprudent disregard of their own safety by the driver and the occupants of said automobile and the speed and manner in which said automobile approached said crossing, without stopping, looking or listening for approaching trains, which were plainly visible and from a position before going on said track of perfect safety and security; * * * that when the operators of said train first became aware or could or under the law should have become aware of the approach of said automobile was at a time and under conditions when it was physically impossible for said train to be stopped or sufficiently slowed down, so as to avoid said accident; the sole and only occasion for which and the proximate cause thereof was the conduct and action of all of the said occupants of said automobile."

And then, alternatively, defendant affirmatively pleads, as a bar, the contributory negligence of the decedents.

The fact that there occurred a collision between an automobile and a train at a grade crossing in a small village offers no presumption of negligence or assumption of liability on the part of the railroad. Negligence is the breach of a legal duty or obligation; it, or the facts upon which it is based, must be pleaded and proved; it is never assumed, presumed, or predicated upon mere inference. Washington v. Yazoo & M. V. R. Co., 11 La.App. 635, 124 So. 631; Illinois Cent. R. Co. v. O'Neill, 5 Cir., 177 F. 328, certiorari denied 217 U.S. 604, 30 S. Ct. 694, 54 L.Ed. 899.

In the absence of some extraordinary or unusual condition or circumstance, a railroad operating through trains on either regular or extra schedules, through small rural hamlets or villages, is not required, in the absence of statute or ordinance, to maintain gates or flag-

men or automatic protection at street crossings or to reduce the usual and customary speed of its trains at these crossings; and, if proper, lawful and adequate warnings are sounded for such crossings, no negligence results, in the absence of proof of existing unusual or extraordinary conditions. Ordinarily a speed of 40 to 45 miles per hour, under normal conditions, is not negligent; and the traveler's inattention, not the train's speed, is the proximate cause of such accidents. 52 C.J. 202 et seq., 209 et seq., 242 et seq.; Washington v. Yazoo & M. V. R. Co., supra; Natal v. Louisiana & A. Ry. Co., 18 La.App. 50, 137 So. 600; Foreman v. Louisiana West. R. Co., 140 La. 389, 73 So. 242.

The following words from the case of Winfiele v. Texas & P. Ry. Co., La.App., 150 So. 43, at page 49, are so very apt to this case that we should quote them: " * * * Had he stopped at either place, and merely glanced northward along the main line, he could not possibly have failed to see the advancing train and take the necessary precaution of avoiding an accident. When he was between the tracks, according to plaintiff's own witness, Hollier, he could see 370 feet north, and when he was 6 feet from the main track he could see 'all the way' up the main line on which the train was coming toward him. To us, the conclusion seems irresistible that he did not stop and he did not look. If he looked, he was bound to have seen the train, and, if seeing it, he nevertheless heedlessly continued on across the track, he failed in that 'standard of conduct,' which courts are asked 'to lay down for once and for all' by the Supreme Court of the United States in the Goodman case [Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645], and his failure constituted negligence on his part which denies his widow and child the right to recover in this action against these defendants."

And we must quote from this case on the phase of excessive speed of the train, pressed by the plaintiff in the instant case, because of the similarity of facts (150 So. at page 45):

"It is not disputed that as this special train passed Rosa, it was going at a fast rate of speed, the trainmen themselves estimating the speed at from 50 to 55 miles per hour. One of them, assigned to the special duty of acting as train master and seeing that the train was properly operated and that the train rules were complied with, had purposely checked the speed about two miles north of Rosa station and found that they were running around 55 miles an hour. Other defendant witnesses, not trainmen, give different estimates of speed ranging from 60 to 70 miles per hour. Plaintiff's witnesses, for the greater part, agree in saying that the train was going faster than the regular trains go through Rosa, and one, particularly, thinks that it was running between 65 and 70 miles an hour.

"The rate of speed of a railroad train, where not regulated by statute or municipal ordinance, depends on the varying conditions which present themselves along the route over which it travels. A speed of 55 or 60 miles per hour which might very well be considered grossly negligent when going through populous centers, may be perfectly proper in the wide open spaces of the country. This, in effect, is what was held years ago by the Supreme Court in the case of Houston v. Vicksburg, S. & P. R. Co., 39 La.Ann. 796, 2 So. 562, has been affirmed in numerous cases since, and reaffirmed only a few weeks ago by the Court of Appeal for the Second circuit, in the case of Jeter v. Texas & Pacific Ry. Co., 149 So. 144, 145, wherein the court said:

" 'In the open country outside city limits, any speed is legitimate for a railroad train which is consistent with its safety. Davis et al., v. Alexandria & W. Ry. Co., 152 La. 898, 94 So. 435.'

"With this principle established, we have now to consider the nature of the route over which this special train of the Missouri Pacific Railroad was traveling at the time of this unfortunate accident."

We make the following quotation from the case of Louisiana & A. Railway Co. v. Jackson, 5 Cir., 95 F.2d 369, at page 372, to show that we know that the Goodman case was elaborated by the Pokora case (95 F.2d at page 372): " * * * When we come to that, we think it perfectly plain that as to the driver of the car, defendant should have had an instructed verdict; for, on a dark and foggy morning, with the windows of his car all tightly closed, he drove recklessly onto defendant's tracks, without stopping as he was by law required and warned by the stop sign to do, while because of the shut windows of the car, and the fog and rain and dark, he could neither hear nor see

the signals evidencing the approach of the train. Baltimore & O. R. Co. v. Goodman, 275 U.S. 66, 48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645; as interpreted and approved in Pokora v. Wabash R. Co., 292 U.S. 98, 54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049; * * *."

■ As illustrative of the Louisiana rule of law that in case of difficulty of seeing or hearing a train as one approaches a crossing, there is a greater caution imposed by law upon the traveler, we cite the case of Barnhill v. Texas & P. Ry. Co., 1902, 109 La. 43, 33 So. 63, 64. Although in this case the following language is found:

"We agree with the district judge that the speed of the train in question was considerably in excess of 12 or 15 miles an hour; that it was nearer 25 miles an hour; and that it was negligence and fault on part of defendant's employés to run a freight train a quarter of a mile long through an incorporated village on a down grade at any such rate of speed. To do so was in reckless disregard of the safety of those who were compelled to cross the track.

"Certainly, no greater rate of speed than 15 miles an hour should have been permitted, and this, too, without regard to whether there was or was not a town ordinance regulating the rate of speed. Sundmaker v. [Yazoo & M. V.] Railway Co., 106 La. 111, 30 So. 285.

"Considering the dangerous rapidity with which this train was permitted to rush through the town, we would hold this defendant liable in damages for the death of Barnhill were it not for his own inexcusable negligence."

—the holding is inapplicable since there is no "down grade" in the instant case, and Justice Blanchard's declaration that the operation of a train under the circumstances at 25 miles an hour was neglectful on the part of the railroad company was a departure from the established jurisprudence of that day (Houston v. Vicksburg, S. & P. R. R. Co., 1887, 39 La.Ann. 796, 2 So. 562), and has not been followed in numerous subsequent decisions of the Louisiana Supreme Court, notably in Winfiele v. Texas & P. Ry. Co., supra, and, again, in Jeter v. Texas & Pacific Ry., La.App.1933, 149 So. 144, at page 145, from which we quote: "In the open country outside city limits, any speed is legitimate for a railroad train which is consistent with its safety. Davis et al. v. Alexandria & W. Ry. Co., 152 La. 898, 94 So. 436."

■■ By the statutes and by the jurisprudence of Louisiana, there is imposed upon passengers or guests in an automobile, as well as upon the driver, a legal duty, at their peril, to stop, look and listen before entering upon a crossing over a railroad track. La.Act 12 of 1924 (Dart's Gen.Stats. (1939 Ed.) Vol. 5, Sec. 8136); Rule of the Road (Acts 1938, No. 286, § 3, Rule 17 Dart's Gen.Stats. (1939 Ed.) Vol. 4, Sec. 5222); 52 C.J. 294, Verbo Railroads, Sec. 1870. Irrespective of the doctrine of imputation of negligence, it is the duty of the occupant of a motor vehicle other than the driver to exercise ordinary care for his own safety, and, where reasonably necessary, to warn the driver of impending danger. Louisiana Arkansas Ry. Co. v. Jackson, 5 Cir., 95 F.2d 369.

We have found the fact to be in this case that the two occupants of the car who were killed as a result of the accident were passengers for hire, and, among the number of cases examined, we think that the full and elaborate discussion of such a status is best given in the case of Martin v. Yazoo & M. V. R. Co., La.App., 181 So. 571, beginning at page 580, to page 584, both inclusive, certiorari denied, May 30, 1938. Of course the facts of this cited case are that the passenger for hire "exercise[s] reasonable care for his own protection." [181 So. 582.] But as our finding of fact discloses, the two passengers for hire in the instant case did nothing whatsoever, either by word or deed, to avoid the accident, and, equally with the driver, apparently were going heedlessly on, unconscious of any danger; or, if conscious of danger, they felt, as the driver did, that the crossing could be made safely in face of the approaching freight train which was seen by all occupants of the car.

■ We like the language of Judge Drew when he summarizes the Louisiana doctrine, at page 582 of this decision in 181 So., in the following words: "We are of the opinion that it is the independent duty of a passenger or guest, when the vehicle in which he is riding is about to traverse a railroad crossing, to use ordinary, reasonable care for his own safety; that the care and precaution required of him is not as great as is that required of

his host, and that the passenger or guest has the right to rely upon the driver to take the necessary precautions for his own safety and his safety until such time as the guest or passenger realizes by observation or otherwise, or should have realized by the use of ordinary care, that the driver is oblivious of the perils and dangers ahead or that he is disregarding them. This is particularly true when the guest or passenger knows that the driver is familiar with the location and the hazards surrounding it. Until such time as the actions of the driver indicate negligence, and the passenger or guest by the exercise of ordinary care has or should have discovered the perils confronting him, he is under no duty to enter a protest."

In Louisiana, under our state rules of jurisdiction of courts, cases of the character of the instant one go on appeal to our Circuit Courts from the District Courts, the courts of original instance; but certiorari to our courts of appeal are received by the Supreme Court of Louisiana, our highest court, at its discretion. The case of Lorance v. Smith et al., 1931, 173 La. 883, 138 So. 871, is a case of this meaningful character, having received consideration by the Supreme Court of Louisiana from an appeal taken from the Court of Appeal, First Circuit, 18 La.App. 519, 132 So. 805, and involves the principle of this case; and we should note the following language taken therefrom (138 So. at page 876):

"'One who rides as a guest or passenger in the automobile of another gratuitously or for compensation must exercise ordinary care to guard himself against injury from the hazards of the road; whether such passenger or guest has exercised reasonable care for his safety being ordinarily a question for the jury.' Blashfield's Cyclopaedia of Automobile Law, Vol. 2, page 1036.

"In the same work, we find it stated that it is the duty of the guest or passenger to warn the driver of the danger which he sees, or which in the exercise of ordinary care he should see, and 'a gratuitous guest in an automobile can not idly sit by, observe clear violations of the law by one operating the automobile at an excessive rate of speed or otherwise, and acquiesce in it, and then hold the driver or owner liable for damages resulting from such violation.' Vol. 2, pages 1087–1095."

Further in the case, after reviewing a number of Louisiana cases, we find this, as the last paragraph (138 So. at page 877): "In all the cases where our court has said that the negligence of the driver cannot be imputed to the guest, the negligence of some third party was involved. Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A.1917F, 253; Churchill v. Texas & Pac. Ry. Co., 151 La. 726, 92 So. 314; Maritzky v. Shreveport Rys. Co., 144 La. 692, 81 So. 253; Young v. Luria, 154 La. 919, 98 So. 419; Vitale v. Checker Cab Co., 166 La. 527, 117 So. 579, 59 A.L.R. 148."

See, also, Ashy v. Missouri Pac. R. Co., La.App., 186 So. 395; Murray v. Yazoo & M. V. R. Co., La.App., 183 So. 543.

The passengers, guests or any occupants of an automobile involved in a grade crossing collision with a train are, not only under the facts, but as a matter of law, barred from recovery, irrespective of the railroad's ordinary negligence, where they have an opportunity to see and hear and warn the driver, but make no effort whatever to do so. Under many Louisiana decisions it is the settled law that it does not avail such persons—driver or passengers—to merely say that they did not see or hear a train. They are, by law, held to have heard and seen that which is readily hearable and plainly visible. The stopping, looking and listening may not be merely perfunctory, but must be done in an effective manner. Barnett v. Louisiana W. R. Co., 141 La. 698, 75 So. 649, L.R.A.1917E, 1124; Young v. Louisiana W. R. Co., 153 La. 129, 95 So. 511; Callery v. Morgan's L. & T. R. & S. S. Co., 139 La. 763, 72 So. 222; Guillot v. Texas & P. R. Co., 8 La.App. 143.

In order that the negligence of a railroad defendant should result in legal liability for injury to a passenger of an automobile struck by a train at a grade crossing, due, primarily, to the driver's carelessness, such negligence must bear a proximate causal connection with the accident. See Vernon v. Illinois Cent. R. Co., 154 La. 370, 97 So. 493; Del Buono v. Illinois Cent. R. Co., 12 La.App. 35, 124 So. 694; Murray v. Yazoo & M. V. R. Co., La.App., 183 So. 543. Then, we must quote at length from the case of Lockhart v. Missouri Pacific R. Co., La.App., 153 So. 577, at pages 579, 580:

"Under the facts of the case it would hardly be argued that Mr. Parks could have recovered for his injuries had he survived the accident. His own gross negligence, independent or contributory, precluded the possibility of such a result. The fact that no suit was filed by his heirs supports such a conclusion. Is the plaintiff in any better position, even though some negligence attaches to defendant?

"If the negligence of plaintiff, assuming that she was guilty of such, was of a primary and independent character, and concurred with that of her father as the, or one of the, proximate causes of the collision, she cannot recover, notwithstanding she was not driving the automobile. In view of the undisputed facts of the case, coupled with plaintiff's own judicial admissions, we do not think the invited guest doctrine applicable. We are convinced that plaintiff was grossly negligent from the moment the car left the highway to the moment of the collision with the train. Her negligence in this respect is of the same grade and character as that of her aged father. It was of an independent character and, like his, was the proximate cause of the accident. The correctness of this conclusion, we think, easily demonstrable from the record. While plaintiff had implicit confidence in her father's ability and skill as the operator of the automobile, yet she was not relying upon this skill and ability for safe conduct over the railroad track. He was not keeping a proper lookout for their safety, and she knew it at the time. Her attention was solely directed to conditions on her right, and so was that of the father, to her knowledge, because, in her petition, she avers: 'She shows that her father was sitting on the left hand or driver's side of the automobile and that she was seated on his right, and that their attention was directed at the approaching trucks from the south and at the point of the turn from the highway into the road eastward.'

"The inattention to things and conditions to their left, disclosed by these allegations, unquestionably continued to the time of the collision.

"The jurisprudence of this state is very much confused, and, we might say, in many respects lacking in uniformity, in cases where the right of the invited guest, the gratuitous guest, or the idle occupant of a car, to recover damages for personal injuries is involved. We think the correct rule is laid down in Ruling Case Law, vol. 20, p. 159: ' * * * Of course, the occupant of a vehicle will not be permitted to recover where it appears that he himself was negligent either in permitting the driver to encounter known dangers, or in failing to use his senses of sight and hearing to discover the perils of the highway.' And in Corpus Juris, vol. 45, p. 1016: 'While negligence of the driver of a vehicle is not ordinarily imputed to an occupant who neither has nor exercises the right to control the driver in the management of the vehicle, it is nevertheless the duty of the occupant to exercise ordinary care to avoid injury. In other words, he is obliged to exercise such care as an ordinarily prudent person, riding with another, would exercise for his own safety under the same or similar circumstances. If he fails to exercise such care, and his failure to do so concurs with the actionable negligence of defendant and contributes to the injury complained of as a proximate cause, he is guilty of contributory negligence. This is true, even though the driver himself was not negligent. Recovery is denied to the occupant in such cases because of his own negligence, and not by virtue of the doctrine of imputed negligence. Ordinary care, however, is all that is required. It is, of course, essential, in order that an occupant may be guilty of contributory negligence, that his failure to exercise ordinary care to avoid injury contribute as a proximate cause to the injury complained of.'

"And in discussing the right of the guest or idle occupant of the car to implicitly rely upon the driver's skill and competency as an operator, it is said:

" 'But an occupant of a vehicle may not abandon the exercise of his own faculties and entrust his safety absolutely to the driver, regardless of the imminence of danger, or the visible lack of ordinary care on the part of the driver to avoid harm. It is his duty to exercise ordinary care to protect himself from known dangers and perils which the attendant circumstances suggest.

" 'While an occupant of a vehicle is not required to exercise the same watchfulness as the driver, it is his duty to exercise ordinary care, including a reasonable use of his faculties of sight, hearing and intelligence, to observe and appreciate danger or threatened danger of injury, and if

he fails to do so, and such failure contributes to the injury complained of as a proximate cause, he is guilty of contributory negligence. However, it cannot be said that it is the duty of an occupant of a vehicle to use his senses in order to discover approaching vehicles and other dangers in every case and under all circumstances. Ordinary care to observe and appreciate danger is all that is required.' Corpus Juris, vol. 45, p. 1017, §§ 567 and 568."

In this case we have no unusual conditions. The conclusion from the facts is inevitable that the proximate cause was not any act of the defendant or any act for which the defendant is responsible. Whether the proximate cause be solely the negligence of the driver, or the negligence of the decedents, or the negligence of both, the defendant is in any event not liable.

The legal principles advanced by plaintiff in his brief are, in review, that the speed of the train was excessive and dangerous; that its length, almost three-fourths of a mile, added to the fact that there was a slight down grade in the direction of the train, plus other circumstances, constituted "extraordinary" hazards, in the language of the brief-writer; and the defendant railroad company is burdened with gross negligence. We have already shown that under the jurisprudence the speed of the train under the circumstances was not an act of negligence. The length of the train is entirely an outside consideration, with no effect, and the slight down grade, as far as we remember, was never proved from the testimony of any of the witnesses. Our finding of fact is that this whole section of country is practically level, and particularly so at the place of accident. The insuperable handicap of plaintiff's position, however, is that all of these things, taken cumulatively, have nothing to do with the proximate cause of the accident. In fact, when strictly analyzed, they are not causal at all, much less being of a proximately causal character.

We have thought of the application of the humanitarian doctrine of the last clear chance in this case, but can find no place for it, since the fireman and engineer did all humanly possible to avert the accident immediately upon the realization of any danger, and the operation of the train was unquestionably perfect, particularly since the negligence of the deceased continued and persisted until the very moment of injury.

We have not made a quotation of the last paragraph of Section 3 of Act 12 of 1924 (Dart's La.Gen.Stats. (1939 Ed.), Vol. 5, Sec. 8138), because its content is so well and commonly known—called the "Stop, Look and Listen" law; but we do desire to make a quotation from the Louisiana Rule of the Road, La.Act 286 of 1938, Sec. 3, Rule 17 (Dart's La.Gen. Stats. (1939 Ed.), Sec. 5222):

"(a) It shall be the duty and obligation of every person owning, driving, operating, or causing or permitting a vehicle to be so driven or operated, when approaching at grade crossing of a public street, road or highway with any steam, electric, street, interurban or other railroad or tramway, operated upon fixed rails or permanent track, to, upon his own responsibility, bring such vehicle to a full and complete stop at such a place, in such a manner and for a sufficient period of time to enable the driver or operator thereof to observe the approach of trains or cars thereon, by looking up and down said track in both directions and by listening therefor, and before proceeding thereon or thereover. In the event it is impossible so to do, then such persons shall proceed only with the greatest caution and at their peril.

"(b) The driver of any motor bus, or other vehicle carrying passengers for hire, charge or compensation * * * in addition to the requirements of paragraph (a) of this rule, shall under no circumstances traverse such crossing when warned by automatic signals, crossing gates, flagmen or other traffic officers or otherwise, of the immediate approach of a railway train or car, nor shall such a person, in any event, traverse such crossing where his view is obstructed or his hearing seriously impaired, howsoever, without making certain, by personal inspection, if necessary, that no such train or car is approaching such crossing."

In the same ratio that extra caution and particular care are required of the driver by the law, with the consequent penalty of no recovery being allowed the driver in case of violation of the injunction of this greater caution and care, extra burdens of responsibility repose on the

444

guests and passengers to exercise some greater degree of care and caution than formerly for themselves and, consequently, also, in that same ratio, the guests and passengers cannot disengage themselves as readily and protect themselves as fully as before on the established principle that the lack of caution and care of the driver is not to be imputed to them.

From our findings of fact, previously given, we have found no act of negligence of the defendant. Therefore, pro arguendo, even if the negligence of the driver is not to be imputed to the decedents, and, furthermore, if decedents are declared free of negligence in not doing anything for their own safety, the defendant is still not liable.

Judgment will be signed dismissing the suit of plaintiffs.